UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
SECURITIES AND EXCHANGE            )
COMM'N,                            )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )   Civil Action No. 05-36 (GK)
                                   )
CHARLES JOHNSON, JR., et al.,      )
                                   )
        Defendants.                )
_____)

## MEMORANDUM OPINION

Plaintiff Securities and Exchange Commission ("SEC") brings this action against four individual Defendants (John Tuli, Kent Wakeford, Christopher Benyo, and Michael Kennedy, collectively "Defendants") alleging a fraudulent scheme to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc. ("PurchasePro"). This matter is before the Court on Defendant Benyo's Motion for Summary Judgment [**Dkt. No. 178**]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendant Benyo's Motion for Summary Judgment is **denied.**

**I.   BACKGROUND**[1]

    **A.   The Defendants' Alleged Scheme**

The Defendants in this case are former executives of both PurchasePro, a publicly traded Internet company that provided a business-to-business internet marketplace, and America Online, Inc. ("AOL").

Starting in December 2000, PurchasePro, AOL, and a third company, AuctioNet, which provided Internet auction services, entered into a series of agreements that required integration of AuctioNet into the websites of PurchasePro and AOL NetBusiness. According to the SEC, the agreements required a complex series of payments amongst the three companies. AOL was to receive $5 million from AuctioNet, keep $1 million for itself, and then pay the remainder (less a 20% commission) to PurchasePro after AOL received the funds. The SEC claims that AOL would begin to pay the net amount of $3.2 million to PurchasePro in quarterly installments beginning April 1, 2001.

The SEC alleges that the Defendants developed a scheme to recognize the revenue from these agreements in the First Quarter of 2001. At the heart of the scheme was an allegedly sham Statement of Work between PurchasePro and AOL ("SOW") that would supposedly reflect that the integration work had occurred in the First

---

[1] Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Material Facts submitted pursuant to Local Civil Rule 7(h).

Quarter, when it fact it had not. The SOW would be used to convince PurchasePro's auditors, Arthur Andersen, that PurchasePro could recognize $3.65 million in revenue in the First Quarter of 2001.[2]

It is undisputed that the SOW was not finalized until after the First Quarter had ended. It is also undisputed that PurchasePro Executive Vice President Geoff Layne and his assistant, James Sholeff, forged the signature of AOL officer Eric Keller on the SOW and that at some point, the SOW was also backdated to a date in the First Quarter. However, the parties fiercely dispute the actual meaning of the SOW's terms. The Defendants contend that sufficient integration work occurred in the First Quarter to meet the requirements set forth in the SOW. The SEC responds that the SOW required integration work that was not completed in the First Quarter.

PurchasePro's outside auditor, Arthur Andersen, began to review PurchasePro's First Quarter revenue shortly after the end of the quarter. The forged and backdated SOW was eventually provided to Arthur Andersen, which placed the document in its files and allegedly relied on it during the course of its audit. Several of the Defendants, as well as Matthew Sorensen, a PurchasePro

---

[2] The $3.65 million figure stated in the SOW is distinct from the $3.2 million that the existing agreements required AOL to pay PurchasePro. The record is unclear regarding the origins and components of the $3.65 million figure.

employee, allegedly made additional deceptive and misleading statements to the auditors regarding the recognition of revenue from the AuctioNet transaction.

On April 26, 2001, PurchasePro executives conducted a conference call with Wall Street analysts, PurchasePro shareholders, and others regarding its First Quarter revenues.  The $3.65 million from the AuctioNet transaction was included in the revenues announced during the call.  Jim Clough, PurchasePro's interim Chief Financial Officer, announced on the call that "[i]t's important to note that a full two-thirds of our revenue for the quarter was AOL-related.  It includes . . . $3.7 million in integration services . . . .  We apply a heightened degree of scrutiny to this revenue given the unique multi-element relationship we have with them."  Pl.'s Statement of Facts, Ex. 27 (PurchasePro.com First Quarter Conference Call Transcript, Apr. 26, 2001) at 3.  The $3.65 million from the AuctioNet transaction represented 12% of PurchasePro's reported First Quarter revenue.

PurchasePro also released a press release on April 26, 2001 announcing earnings, which included the $3.65 million in revenue from the AuctioNet transaction.  Arthur Andersen did not review this press release prior to its release.

On May 14, 2001, AOL sent a letter to PurchasePro stating that it could not confirm the existence of the SOW.  PurchasePro, with the agreement of Arthur Andersen, subsequently decided that the

4

$3.65 million from the AuctioNet transaction should not have been included in PurchasePro's quarterly revenues. Accordingly, this revenue was not included in the Form 10-Q PurchasePro filed with the SEC on May 29, 2001.

**B.   Benyo's Alleged Role in the Scheme**

Defendant Christopher Benyo was PurchasePro's Senior Vice President for Marketing and Network Development during the relevant period.  The SEC alleges that Benyo violated four sections of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq. Specifically, the SEC alleges that Benyo aided and abetted PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 (Count III); falsified books and records and circumvented internal controls in violation of Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 (Count IV); misled an accountant or auditor in violation of Exchange Act Rule 13b2-2 (Count VI); and aided and abetted PurchasePro's falsification of books and records and circumvention of its system of internal controls in violation of Exchange Act Sections 13(b)(2)(A) and (B), 15 U.S.C. § 78m(b)(2)(A) and (B) (Count IX).

Specifically, the SEC alleges that Benyo helped orchestrate the creation of the fraudulent SOW.  The SEC claims that the drafting of the SOW was initially the responsibility of an in-house lawyer at PurchasePro, but when he raised questions about the validity of the document, Benyo's "group" of employees in

PurchasePro's Marketing Department was given this responsibility. Dale Boeth, PurchasePro's Senior Vice President for Strategic Development, has testified that he instructed Benyo to provide resources to get the SOW completed and that it was necessary for PurchasePro to recognize revenue.  Pl.'s Statement of Facts, Ex. 17 (United States v. Benyo Trial Transcript, Nov. 28, 2006) ("Boeth Tr.") at 3187.  Boeth discussed "how to best structure the transaction, what it needed to be -- how to document the transaction, and how to recognize the revenue" with a group that included Benyo.  Id. at 3189.  Boeth personally considered the transaction to be "dirty."  Id. at 3198.

The SEC contends that Benyo then instructed two of his subordinates, Barry Joyce and Matthew Sorensen, to put together the SOW at the end of March and the beginning of April, as evidenced by a series of e-mails to and from Benyo.  Sorensen e-mailed a copy of the completed SOW to Benyo and Boeth on April 5, 2001.  The document was unsigned, but bore a date of February 5, 2001 on its cover page.

The SEC argues that because Benyo knew that the integration work described in the SOW was not yet completed, he had to have been aware of the fraudulent nature of the SOW.  For example, an April 1, 2001 e-mail from Joyce to Benyo scheduling a meeting for the next day noted that "[t]here are final integration efforts that will require a team effort . . . to accomplish."  Pl.'s Statement

of Facts, Ex. 39.  Another e-mail from Joyce on April 2, 2001, indicated that integration work with AOL remained ongoing.  Pl.'s Statement of Facts, Ex. 42.  Benyo responded with an e-mail asking "[h]ow much of this is going to be done now?"  Pl.'s Statement of Facts, Ex. 44.  Benyo denies any role in creating the fraudulent portions of the SOW.

On April 2, 2001, fifteen to twenty PurchasePro employees met to consider additional AuctioNet integration work.  Sorensen, who was present, described the attendees as angry that they were being asked to complete so much work in so little time and characterized the meeting as a "freak-out" session.  Pl.'s Statement of Facts, Ex. 12 (Sorensen Dep., June 26, 2007) ("Sorensen Dep.") at 201-206.  A smaller meeting followed, attended by Benyo, Sorensen, and Defendant Michael Kennedy, PurchasePro's Chief Technology Officer.  Sorensen testified in his deposition that "what I remember best [about the meeting] is the result of that conversation, which was basically Chris Benyo saying we can put up a [hypertext] link and circle back and do the work before the auditors arrive."  Id. at 213.  Dale Boeth testified that Benyo had conceived of the hypertext link and that the purpose was to deceive Arthur Andersen. Boeth Tr. at 3194-95.

Later in April, Sorensen gave an allegedly deceptive presentation to Arthur Andersen regarding the AuctioNet

transaction.  Following the presentation, Sorensen went to Benyo's office:

> A. I told him [Benyo] that Mike Stella had asked me to demonstrate the integration work for the SOW.  I believe I told Chris that I demonstrated the link and alluded to more being there than what there really was.
>
> Q. Okay.  What did Mr. Benyo say?
>
> A. He was quiet for a moment, and he said, I'll be glad when this is over.
>
> Q. Was that the end of the conversation you had with him?
>
> A. That was it.

Sorensen Dep. at 254.[3]

Prior to PurchasePro's announcement of its First Quarter earnings in its April 26, 2001 analyst call, PurchasePro executives held a number of meetings to discuss what revenue could be recognized in the First Quarter.  When the revenue associated with AuctioNet and the SOW were discussed, Benyo allegedly voiced no opposition to including this revenue in PurchasePro's quarterly earning announcement.  Boeth Tr. at 3216.

---

[3] Benyo claims that this conversation could never have taken place because he was out of town when Sorensen gave the presentation.

Benyo was an active participant on the April 26, 2001 analyst conference call.  He made a number of references to revenue related to PurchasePro's relationship with AOL.  The SEC contends that Benyo failed to disclose any facts relating to the fraudulent nature of the SOW during the call.

The SEC also alleges that Benyo stood to personally gain from PurchasePro's performance.  It is undisputed that he held options to purchase company stock and received an additional grant of options on April 10, 2001.  Like other PurchasePro executives, he also received $100,000 as a retention bonus during the First Quarter.

C.  **Procedural History**

The Government brought both criminal and civil cases against the Defendants.  This civil case was stayed from November 9, 2005 until March 13, 2007, during which five Defendants were tried in the Federal District Court for the Eastern District of Virginia.  Wakeford, Tuli, and Benyo were tried and acquitted.  The charges against Defendant Kennedy were voluntarily dismissed by the Government.  A mistrial was declared as to the fifth Defendant, Charles Johnson, Jr.  His retrial began October 9, 2007 and Judge Walter DeKalb Kelley, Jr. of the Eastern District of Virginia has the case under advisement.  Scott Wiegand, PurchasePro's General Counsel, was acquitted following a bench trial in December 2005.

Upon completion of the criminal cases of the four Defendants, the stay in this civil case was lifted as to four of the Defendants (Wakeford, Tuli, Kennedy, and Benyo) but not as to Defendant Johnson, Jr.  After their acquittals, the four Defendants were extremely anxious to schedule an early trial in this case in the hope that they would be able to clear their names completely and resume normal lives.  For that reason, and because of the age of the case, on May 7, 2007, this Court entered a Scheduling Order with very short deadlines.  On July 13, 2007, at the request of the SEC, and over the objection of the Defendants, the Court extended discovery for one month until August 30, 2007.  Numerous depositions were held during the discovery period, and counsel on all sides worked diligently to complete discovery during that period.  In accordance with the Scheduling Order, summary judgment motions were filed by the Defendants on October 10, 2007.  On December 18, 2007, trial was continued as to Defendant Tuli until July 7, 2008, with the consent of the SEC.

## II.  STANDARD OF REVIEW

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006).  In other words, the

moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is it is "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).[4] A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

In its most recent discussion of summary judgment, in Scott v. Harris, __ U.S. __, 127 S. Ct. 1769, 1776 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 . . . (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine*

---

[4] In opposing Benyo's Motion for Summary Judgment, the SEC attempts to rely on Federal Bureau of Investigation ("FBI") Form 302 reports of statements made by Benyo during two proffer sessions conducted as part of plea negotiations with the Department of Justice. As the parties are aware, these FBI Form 302 reports are the focus of several pending motions in limine which have not yet been fully briefed. As briefing on that issue remains outstanding, the admissibility of the Form 302s will not be addressed here. It deserves to be noted, however, that even assuming the correctness of Benyo's argument that such evidence should be excluded, summary judgment still would be inappropriate.

11

issue of *material* fact." Liberty Lobby, 477 U.S. at 247-48.

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 248, 249.  In both Liberty Lobby and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. Liberty Lobby, 477 U.S. at 255.  In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "the Court must draw all reasonable inferences in favor of the non-moving party." Reeves, 530 U.S. at 150.  "To survive a motion for summary judgment, the party bearing the burden of proof at trial . . . must provide evidence showing that there is a triable issue as to an element essential to that party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)." Arrington, 473 F.3d at 335.[5]

---

[5] It should be noted that a non-movant's affidavit may suffice to defeat a summary judgment motion if the parties' sworn statements are materially different. Greene v. Dalton, 164 F.3d 671, 674-75 (D.C. Cir. 1999); Arrington, 473 F.3d at 337.

**III. ANALYSIS**

    **A. Summary Judgment Is Denied as to Count III (Aiding and Abetting PurchasePro's Alleged Rule 10b-5 Violation)**

The SEC must prove three elements to establish liability for aiding and abetting a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. First, a principal must commit a primary violation. Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000). Second, the aider and abettor must provide "substantial assistance" to the primary violator. Id. Third, the aider and abettor must act with the requisite scienter. Id.; SEC v. Fehn, 97 F.3d 1276, 1288 n.11 (9th Cir. 1996); SEC v. KPMG LLP, 412 F. Supp. 2d 349, 382-83 (S.D.N.Y. 2006); see also the Court's Op. Den. Def. Wakeford's Mot. for Summ. J. at 15-19.

The SEC alleges that Benyo provided substantial assistance to PurchasePro's primary Rule 10b-5 violation, namely, the inclusion of $3.65 million in AuctioNet revenue in the April 26, 2001 analyst call and associated press release.[6]

Benyo argues that the SEC cannot prove that he provided substantial assistance to PurchasePro's primary securities law violation. He contends that because PurchasePro President and Chief Operating Officer Shawn McGhee did not rely on the SOW when deciding to recognize AuctioNet integration revenue, there is no

---

[6] Contrary to Benyo's contention in his Reply, the SEC does not base its theory of PurchasePro's alleged Rule 10b-5 violation on misrepresentations contained in internal communications made to auditors. See Pl.'s Opp'n at 21-22.

13

evidence linking Benyo to the decision by PurchasePro to include the AuctioNet revenue in First Quarter earnings. He also argues that all work required under the SOW was completed by the end of the First Quarter. Thus, he claims that any integration work that occurred in the Second Quarter is immaterial.

The SEC has raised a genuine dispute of material fact regarding each of Benyo's arguments and summary judgment is therefore inappropriate.

First, there is a genuine dispute of fact regarding the degree of reliance McGhee placed on the SOW in deciding to recognize AuctioNet integration revenue. In his December 2006 trial testimony, McGhee said he had concerns about the authenticity of the SOW, but that the revenue documented in the SOW was still included in earnings because PurchasePro management sought additional confirmation of the AuctioNet revenue. Pl.'s Statement of Facts, Ex. 22 (United States v. Benyo Trial Transcript, Dec. 20, 2006) at 6364-65. A reasonable factfinder could construe McGhee's testimony to mean that he did rely on the SOW, at least in part, as well as other documentation, in deciding to recognize the AuctioNet revenue. Furthermore, the SEC correctly points out that in weighing McGhee's credibility, the jury could consider that had the SOW not been created in the first place, McGhee would have had no revenue to confirm from additional sources.

evidence linking Benyo to the decision by PurchasePro to include the AuctioNet revenue in First Quarter earnings. He also argues that all work required under the SOW was completed by the end of the First Quarter. Thus, he claims that any integration work that occurred in the Second Quarter is immaterial.

The SEC has raised a genuine dispute of material fact regarding each of Benyo's arguments and summary judgment is therefore inappropriate.

First, there is a genuine dispute of fact regarding the degree of reliance McGhee placed on the SOW in deciding to recognize AuctioNet integration revenue. In his December 2006 trial testimony, McGhee said he had concerns about the authenticity of the SOW, but that the revenue documented in the SOW was still included in earnings because PurchasePro management sought additional confirmation of the AuctioNet revenue. Pl.'s Statement of Facts, Ex. 22 (United States v. Benyo Trial Transcript, Dec. 20, 2006) at 6364-65. A reasonable factfinder could construe McGhee's testimony to mean that he did rely on the SOW, at least in part, as well as other documentation, in deciding to recognize the AuctioNet revenue. Furthermore, the SEC correctly points out that in weighing McGhee's credibility, the jury could consider that had the SOW not been created in the first place, McGhee would have had no revenue to confirm from additional sources.

Benyo's related argument that there is no evidence that he substantially assisted in the creation of the SOW is equally unavailing. The SEC has offered evidence showing that Benyo instructed two subordinates, Joyce and Sorensen, to put together the SOW after the close of the First Quarter. The SEC has presented e-mails to and from Benyo stating that some of the integration work described in the SOW had not yet been completed, and that Benyo was therefore aware of the fraudulent nature of the SOW.[7] Perhaps most significantly, there is evidence that Benyo suggested a hypertext link be set up to mislead auditors about the extent of integration work that had been completed in the First Quarter. This evidence is adequate to raise a genuine dispute of material fact after drawing all reasonable inferences in favor of the SEC.

Second, there remains a genuine dispute of material fact for a jury to resolve as to whether the work specified in the SOW had in fact been completed in the first quarter. Sorensen testified on direct examination in the criminal trial that the SOW required full integration to occur in the First Quarter. On cross-examination, he then retracted this testimony, testifying instead that the SOW only required completion of one of the integration

---

[7] As discussed below, there is a genuine dispute of material fact concerning whether the SOW required all integration items to be completed in the First Quarter.

tasks it listed, work that had in fact been completed in the First Quarter.

Sorensen's initial understanding of the SOW's requirements was corroborated by the trial testimony of Dale Boeth and testimony Defendant Kennedy gave before the SEC in 2002. Cindi Zimmerman, a member of Defendant Kennedy's technology staff, also stated in an e-mail that as of March 30, 2001, "NO integration existed." Pl.'s Statement of Facts, Ex. 96 (E-mail from Zimmerman to Kennedy, Apr. 2, 2001) (emphasis in original). This conflicting evidence concerning whether the work specified in the SOW had been completed in the First Quarter is sufficient to defeat summary judgment.

Accordingly, Benyo's motion for summary judgment as to Count III is **denied.**

### B. Summary Judgment Is Denied as to Count IV (Falsifying Books and Records and Circumventing Internal Controls)

Count IV alleges that Benyo violated Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, by circumventing PurchasePro's internal controls and falsifying its books and records. The SEC need not prove scienter to establish a violation of Rule 13b2-1. McConville v. SEC, 465 F.3d 780, 789 (7th Cir. 2006); SEC v. McNulty, 137 F.3d 732, 740-41 (2d Cir. 1998).

As discussed above, the SEC has come forward with sufficient evidence for a reasonable jury to conclude that Benyo violated Rule 13b2-1 by coordinating the drafting of the SOW and by suggesting

16

that a hypertext link be set up to deceive Arthur Andersen about the extent of AuctioNet integration work that had already occurred. Therefore, Benyo's motion for summary judgment on Count IV is **denied**.

### C. Summary Judgment Is Denied as to Count VI (Misleading an Accountant or Auditor)

Rule 13b2-2, 17 C.F.R. § 240.13b2-2, prohibits making or causing to be made a materially false or misleading statement to an accountant in connection with an audit.

The SEC has presented evidence demonstrating a genuine dispute of fact about whether Benyo violated Rule 13b2-2 by causing materially false or misleading statements to be made to Arthur Andersen auditors in the course of their review of the AuctioNet transaction. The SEC argues that Benyo coordinated the creation of the fraudulent SOW which was later presented to Arthur Andersen and that he suggested the creation of a hypertext link to deceive the auditors regarding the amount of integration work that had occurred. Even if Benyo did not personally make the misleading statements, as he contends, that is not necessary for liability to attach under Rule 13b2-2. It is enough that the SEC presented evidence that he "cause[d]" such statements to be made. 17 C.F.R. § 240.13b2-2(a)(1).[8]

---

[8] Benyo also argues that Rule 13b2-2 does not apply to the April 26, 2001 press release because Arthur Andersen did not review it and the press release is unrelated to any filing made by
(continued...)

Because the SEC has presented evidence showing the existence of a genuine issue of material fact concerning whether Benyo caused materially false or misleading statements be made to Arthur Andersen, Benyo's motion for summary judgment on Count VI is **denied**.

**D.    Summary Judgment Is Denied as to Count IX (Aiding and Abetting PurchasePro's Alleged Falsification of Books and Records and Circumvention of its System of Internal Controls)**

To establish liability for aiding and abetting a violation of Exchange Act Sections 13(b)(2)(A) and (B), 15 U.S.C. § 78m(b)(2)(A) and (B), the SEC must prove (1) that PurchasePro committed a primary violation; (2) that Benyo substantially assisted the violation;[9] and (3) that he acted with the requisite scienter. Ponce v. SEC, 345 F.3d 722, 737 (9th Cir. 2003); see also the

---

[8](...continued)
PurchasePro with the SEC. This argument misses the mark. Rule 13b2-2 applies to "any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart." 17 C.F.R. § 240.13b2-2(a)(2)(I). As discussed above, the SEC has presented evidence that raises a genuine issue as to whether Arthur Andersen auditors were misled during the course of their audit. The April 26, 2001 press release has no bearing on that question.

[9] Benyo argues that "substantial assistance" requires a showing that the aider and abettor was a proximate cause of the statutory violation, citing case law from the Second Circuit. See, e.g., Bloor v. Carro, Spanback, Landin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985). Our Court of Appeals has not expressly adopted this formulation of the "substantial assistance" requirement. See Graham, 222 F.3d at 1000. Nevertheless, the SEC has provided sufficient evidence to raise a genuine dispute of material fact under either standard.

Court's Op. Den. Def. Wakeford's Mot. for Summ. J. at 15-19 (discussing the scienter standard set forth under Section 20(e) for aiding and abetting securities violations).

Benyo argues that the SEC cannot prove that he was a proximate cause of PurchasePro's falsification of books and records and circumvention of internal controls. Again, this argument falls short. The SEC has provided evidence showing that he coordinated the creation of the SOW and conceived of the scheme to create the deceptive hypertext link to make the auditors believe AuctioNet integration work had already occurred, as discussed above. Thus, there is a genuine issue of material fact regarding whether Benyo aided and abetted PurchasePro's falsification of books and records and circumvention of internal controls.

Accordingly, Benyo's motion for summary judgment on Count IX is **denied.**

## IV.  CONCLUSION

For the reasons set forth above, Defendant Benyo's Motion for Summary Judgment [**Dkt. No. 178**] is **denied.** An Order shall issue with this Memorandum Opinion.

January 16, 2008

/s/
Gladys Kessler
United States District Judge

**Copies to: Attorneys of record via ECF**