**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMM'N, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 05-36 (GK) |
| | ) |
| CHARLES JOHNSON, JR., <u>et al.</u>, | ) |
| | ) |
| Defendants. | ) |

---

**<u>MEMORANDUM OPINION</u>**

Plaintiff Securities and Exchange Commission ("SEC") brings this action against four individual Defendants (John Tuli, Kent Wakeford, Christopher Benyo, and Michael Kennedy, collectively "Defendants") alleging a fraudulent scheme to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc. ("PurchasePro"). This matter is before the Court on Defendant Wakeford's Motion for Summary Judgment [**Dkt. No. 177**]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendant Wakeford's Motion for Summary Judgment is **denied.**

I.    **BACKGROUND**[1]

A.    **The Defendants' Alleged Scheme**

The Defendants in this case are former executives of both PurchasePro, a publicly traded Internet company that provided a business-to-business internet marketplace, and America Online, Inc. ("AOL").

Starting in December 2000, PurchasePro, AOL, and a third company, AuctioNet, which provided Internet auction services, entered into a series of agreements that required integration of AuctioNet into the websites of PurchasePro and AOL NetBusiness. According to the SEC, the agreements required a complex series of payments amongst the three companies.  AOL was to receive $5 million from AuctioNet, keep $1 million for itself, and then pay the remainder (less a 20% commission) to PurchasePro after AOL received the funds.  The SEC claims that AOL would begin to pay the net amount of $3.2 million to PurchasePro in quarterly installments beginning April 1, 2001.

The SEC alleges that the Defendants developed a scheme to recognize the revenue from these agreements in the First Quarter of 2001.  At the heart of the scheme was an allegedly sham Statement of Work between PurchasePro and AOL ("SOW") that would supposedly reflect that the integration work had occurred in the First

_____

[1] Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Material Facts submitted pursuant to Local Civil Rule 7(h).

Quarter, when it fact it had not.  The SOW would be used to convince PurchasePro's auditors, Arthur Andersen, that PurchasePro could recognize $3.65 million in revenue in the First Quarter of 2001.[2]

It is undisputed that the SOW was not finalized until after the First Quarter had ended.  It is also undisputed that PurchasePro Executive Vice President Geoff Layne and his assistant, James Sholeff, forged the signature of AOL officer Eric Keller on the SOW and that at some point, the SOW was also backdated to a date in the First Quarter.  However, the parties fiercely dispute the actual meaning of the SOW's terms.  The Defendants contend that sufficient integration work occurred in the First Quarter to meet the requirements set forth in the SOW.  The SEC responds that the SOW required integration work that was not completed in the First Quarter.

PurchasePro's outside auditor, Arthur Andersen, began to review PurchasePro's First Quarter revenue shortly after the end of the quarter.  The forged and backdated SOW was eventually provided to Arthur Andersen, which placed the document in its files and allegedly relied on it during the course of its audit.  Several of the Defendants, as well as Matthew Sorensen, a PurchasePro

---

[2] The $3.65 million figure stated in the SOW is distinct from the $3.2 million that the existing agreements required AOL to pay PurchasePro.  The record is unclear regarding the origins and components of the $3.65 million figure.

employee, allegedly made additional deceptive and misleading statements to the auditors regarding the recognition of revenue from the AuctioNet transaction.

On April 26, 2001, PurchasePro executives conducted a conference call with Wall Street analysts, PurchasePro shareholders, and others regarding its First Quarter revenues.  The $3.65 million from the AuctioNet transaction was included in the revenues announced during the call.  Jim Clough, PurchasePro's interim Chief Financial Officer, announced on the call that "[i]t's important to note that a full two-thirds of our revenue for the quarter was AOL-related.  It includes . . . $3.7 million in integration services . . . .  We apply a heightened degree of scrutiny to this revenue given the unique multi-element relationship we have with them."  Pl.'s Statement of Facts, Ex. 27 (PurchasePro.com First Quarter Conference Call Transcript, Apr. 26, 2001) at 3.  The $3.65 million from the AuctioNet transaction represented 12% of PurchasePro's reported First Quarter revenue.

PurchasePro also released a press release on April 26, 2001 announcing its earnings, which included the $3.65 million in revenue from the AuctioNet transaction.  Arthur Andersen did not review this press release prior to its release.

On May 14, 2001, AOL sent a letter to PurchasePro stating that it could not confirm the existence of the SOW.  PurchasePro, with the agreement of Arthur Andersen, subsequently decided that the

$3.65 million from the AuctioNet transaction should not have been included in PurchasePro's quarterly revenues.  Accordingly, this revenue was not included in the Form 10-Q PurchasePro filed with the SEC on May 29, 2001.

**B.   Wakeford's Alleged Role in the Scheme**

Defendant Kent Wakeford was AOL's Executive Director of Business Affairs during the relevant period.  The SEC alleges that Wakeford violated section 20(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a <u>et</u> <u>seq</u>.  Specifically, the SEC alleges that Wakeford aided and abetted PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 (Count III); aided and abetted certain PurchasePro officers' violations of Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 by falsifying books and records and circumventing internal controls (Count V); aided and abetted certain PurchasePro officers' violations of Rule 13b2-2 by misleading an accountant or auditor (Count VII); and aided and abetted PurchasePro's violations of Exchange Act Sections 13(b)(2)(A) and (B), 15 U.S.C. § 78m(b)(2)(A) and (B), by falsifying books and records (Count IX).

The SEC alleges that Wakeford devised the scheme that would allow PurchasePro to wrongfully recognize revenue in the First Quarter; in other words, the SEC contends that Wakeford suggested creation of the SOW to enable PurchasePro to claim it already had

completed its integration work in the First Quarter of 2001.  Pl.'s
Mem. in Opp. to Def. Kent Wakeford's Mot. for Summ. J. ("Opp.") at
3.

On March 28, 2001, Wakeford received an e-mail from Jeff
Anderson, PurchasePro's Senior Vice President of Sales and
Strategic Development during the time in question, stating what
revenue PurchasePro expected from AOL and noting PurchasePro's
"aggressive" efforts to identify additional revenue in order to
meet First Quarter projections.  See Pl.'s Statement of Facts, Ex.
61 (Mar. 28, 2001 e-mail from Anderson to Wakeford).  The SEC
alleges that the projected quarterly financial statements
PurchasePro presented to Wakeford contained a line item for what
PurchasePro needed to obtain from AOL to meet its quarterly
numbers.  Pl.'s Statement of Facts, Ex. 70 (May 1, 2001 Doherty
Memo recording Part II of Wakeford Apr. 30, 2001 Interview
("Wakeford Interview")) at 7; Pl.'s Statement of Facts, Ex. 6 (Aug.
20, 2007 Doherty-Minicozzi Dep.).  Wakeford also knew that AOL's
CEO and co-founder, Charles Johnson, Jr., was unhappy with the
revenue being generated for PurchasePro by AOL.  Reply at 6.

Although no payments were due to PurchasePro under the
AuctioNet contract until April 2001, Wakeford suggested to Johnson
that PurchasePro could include revenues from AOL in its projections
for First Quarter 2001 earnings.  Reply at 6; Mot. at 10.  Wakeford
alleges that he had reviewed AOL internal documents indicating that

-6-

PurchasePro had earned revenue under the AuctioNet contracts in the First Quarter, and that when he noticed that PurchasePro had not included this revenue in its First Quarter projections, he suggested to Johnson that some revenue could be recognized.  Reply at 5-6.

The SEC alleges that in the First Quarter of 2001, AOL and PurchasePro were working together to help each other meet their respective quarterly revenue projections.  The SEC further alleges that as part of this effort, Wakeford was actively involved in helping PurchasePro achieve its revenue goals, and that upon hearing from PurchasePro that it was falling far short of those goals, he came up with the scheme to recognize all of the future revenue from the AuctioNet integration at once, through creation of a Statement of Work showing that all of the First Quarter integration work already had been completed.

Both parties agree that on a late March conference call, Wakeford shared with various PurchasePro personnel his suggestion that PurchasePro claim some AuctioNet revenue in the First Quarter. D.'s Statement of Facts ¶17.  The SEC also alleges that on this call Wakeford told PurchasePro personnel that if they would create the SOW to document performance of the AuctioNet integration work, that AOL would pay PurchasePro the full contract amount, thereby allowing PurchasePro to recognize all of the AuctioNet revenue in the First Quarter.  Opp. at 3.

Shortly after the conference call, PurchasePro's co-founder and Executive Vice President, Geoff Layne, contacted Wakeford and requested information regarding a "Statement of Work" being created in connection with the AuctioNet contract.  D.'s Statement of Facts ¶20.  Geoff Layne testified that he sent an e-mail to Wakeford requesting a copy of AOL's agreement with AuctioNet so that he could "put together a statement of work so we could recognize 3.65 million in revenue for integration work."  Pl.'s Statement of Facts, Ex. 20 (<u>United States v. Benyo</u> Trial Transcript, Dec. 6, 7, & 11, 2006) ("Layne Tr.")) at 1296.  Wakeford forwarded Layne the requested AOL agreement.  Layne later used the signature on this document as the template for the forged AOL signature on the SOW. Pl.'s Statement of Facts, Ex. 14 (Wakeford Jul. 26, 2007 Dep. ("Wakeford Dep.")) at 88:16-89:3.

The SEC also alleges that shortly before PurchasePro publicly announced its revenue for the First Quarter of 2001, Wakeford further assisted the scheme by instructing John Tuli, an AOL Vice President of Strategy and Business Development for NetBusiness, to provide additional confirmation to Arthur Andersen, PurchasePro's auditors, that the work set forth in the SOW had been completed. Sholeff had requested that Tuli sign a certification for PurchasePro auditors that the work had been completed as of March 30, 2001.  Tuli sought approval from Wakeford to sign the certification letter, e-mailing a copy of the draft acknowledgment

letter to Wakeford in an e-mail that stated, "Urgent-Auctionet," and "[w]hat am I signing for Ppro auditors? . . . . Should I sign this?"  Pl.'s Statement of Facts, Ex. 13 (Tuli Aug. 30, 2007 Dep. ("Tuli Dep.")) at 87; Pl.'s Statement of Facts, Ex. 53 (Apr. 20, 2001 e-mail chain, including e-mail from Tuli to Wakeford).  The SEC alleges that Wakeford either asked Tuli to check if some of the work had been done, or asked if Tuli had checked on whether the work was completed, and that after Tuli informed Wakeford that the work had not been completed, he instructed Tuli to sign anyway. Pl.'s Statement of Facts, Ex. 73 (May 10, 2001 Riewe memo recording May 10, 2001 Tuli Interview ("Tuli Interview")) at 1.  Wakeford contends that he asked Tuli whether the work had been completed, that Tuli said it had been, and therefore that he told Tuli to sign the certification.  D.'s Statement of Facts at 26-27.

Tuli signed the certification on April 20, 2001.  It stated that "all work covered under the Statement of Work dated February 5, 2001 was completed and accepted as of March 30, 2001."  Tuli also provided Wakeford with a copy of it.  Tuli Dep. at 95-96.  The letter was faxed to PurchasePro Chief Accounting Officer Scott Miller with a cover page stating that it was "From: Kent Wakeford." Pl.'s Statement of Facts, Ex. 51 (Apr. 20, 2001 fax from Wakeford to Miller).  The letter was later provided to Arthur Andersen.  The SEC contends that it was relied upon both by Arthur Andersen in its review of SOW revenue and by PurchasePro senior management in the

decision of what revenue to include in the April 26, 2001 earnings announcement.  Pl.'s Statement of Facts ¶14(g) & (h).

On April 23, 2001, Jeff Anderson sent a "collections follow-up" e-mail to Wakeford, seeking confirmation that $3.65 million for "auctionet integration" would be wired to PurchasePro that day. The e-mail also indicated that it was very important that PurchasePro receive the money that day, "as our auditors close out our books for our earnings announcement."  Pl.'s Statement of Facts, Ex. 75.  Wakeford responded, "still working it."  Pl.'s Statement of Facts, Ex. 76.  The SEC alleges that Wakeford then asked AOL's Assistant Controller, Joe Quinn, about sending a wire transfer of around $3.5 million to PurchasePro, but Quinn told Wakeford that proper paperwork would have to be filled out and payment procedures would have to be followed.  Pl.'s Statement of Facts, Ex. 23 (United States v. Benyo Trial Transcript, Jan. 3, 2007) at 6848-50.

Arthur Andersen also sought confirmation of the SOW obligation via a conference call.  Layne contacted Wakeford about who at AOL the auditors should speak with, and Wakeford directed him to Tuli. Tuli contacted Layne prior to the call and allegedly asked him what questions the auditors would ask and what the correct answers were. Layne Tr. at 4851.  Layne sent an e-mail to Tuli, copying Wakeford, on April 24, 2001, providing a list of auditor questions and "our answers."  Pl.'s Statement of Facts, Ex. 54.  The SEC alleges that

-10-

the call took place on April 25 or 26, 2001.

On April 18, 2001, Kimo Akiona of Arthur Andersen faxed Wakeford a letter from PurchasePro Comptroller Michael Stella that requested, among other things, confirmation that AOL owed PurchasePro the sum of $3.65 million as of March 31, 2001.[3] Wakeford contacted Eric Keller, Wakeford's superior, about the audit confirmation request. Keller directed Wakeford to send the request to him, as well as to AOL's General Counsel (Randall Boe) and the President of Wakeford's division (David Colburn). Wakeford did as he was instructed, and shortly thereafter, AOL initiated an internal investigation of the matter.

### C.   Procedural History

The Government brought both criminal and civil cases against the Defendants. This civil case was stayed from November 9, 2005 until March 13, 2007, during which Defendants Wakeford, Tuli, and Benyo were tried and acquitted in the Federal District Court for the Eastern District of Virginia. The charges against Defendant Kennedy were voluntarily dismissed by the Government. A mistrial was declared as to the fifth Defendant, Charles Johnson, Jr. His retrial began October 9, 2007 and Judge Walter DeKalb Kelley, Jr. of the Eastern District of Virginia has the case under advisement. Scott Wiegand, PurchasePro's General Counsel, was acquitted

---

[3]Wakeford asserts that he first saw this fax on April 24, 2001.

following a bench trial in December 2005.

Upon completion of the criminal cases of the four Defendants, the stay in this civil case was lifted as to four of the Defendants (Wakeford, Tuli, Kennedy, and Benyo) but not as to Defendant Johnson, Jr.  After their acquittals, the four Defendants were extremely anxious to schedule an early trial in this case in the hope that they would be able to clear their names completely and resume normal lives.  For that reason, and because of the age of the case, on May 7, 2007, this Court entered a Scheduling Order with very short deadlines.  On July 13, 2007, at the request of the SEC, and over the objection of the Defendants, the Court extended discovery for one month until August 30, 2007.  Numerous depositions were held during the discovery period, and counsel on all sides worked diligently to complete discovery during that period.  In accordance with the Scheduling Order, summary judgment motions were filed by the Defendants on October 10, 2007.  On December 18, 2007, trial was continued as to Defendant Tuli until July 7, 2008, with the consent of the SEC.

## II.  STANDARD OF REVIEW

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United

-12-

<u>States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006).  In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is it is "material" to the case.  "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  <u>Arrington</u>, 473 F.3d at 333*, <u>quoting</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" if it might affect the outcome of the case under the substantive governing law.  <u>Liberty Lobby</u>, 477 U.S. at 248.

In its most recent discussion of summary judgment, in <u>Scott v. Harris</u>, __ U.S. __, 127 S.Ct. 1769, 1776 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 . . . (1986) (footnote omitted).  "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."
>
> <u>Liberty Lobby</u>, 477 U.S. at 247-48.

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter,

but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 248, 249.  In both Liberty Lobby and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment.  Liberty Lobby, 477 U.S. at 255.

In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "[t]he non-moving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255). "To survive a motion for summary judgment, the party bearing the burden of proof at trial . . . must provide evidence showing that there is a triable issue as to an element essential to that party's claim."  Arrington, 473 F.3d at 335[4]; see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  "[I]f the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary judgment is improper."  United States v. Philip Morris, 316 F.

---

[4]It should be noted that a non-movant's affidavit may suffice to defeat a summary judgment motion if the parties' sworn statements are materially different.  Greene v. Dalton, 164 F.3d 671, 674-75 (D.C. Cir. 1999); Arrington, 473 F.3d at 337.

Supp. 2d 13, 16 (D.D.C. 2004) (quoting <u>Greenberg v. FDA</u>, 803 F.2d 1213, 1216 (D.C. Cir. 1986)).

## III. ANALYSIS

The SEC brings its aiding and abetting claims against Wakeford under Section 20(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78t(e)),[5] and the regulations promulgated thereunder (Rules 10b-5, 13b2-1, and 13b2-2).  Section 20(e) is part of a 1995 amendment to the Exchange Act known as the Private Securities Litigation Reform Act of 1995 or "PSLRA."  Pub. L. No. 104-67, § 104, 109 Stat. 737, 757 (1995).  Legislative history indicates that the PSLRA was passed to override the Supreme Court's decision in <u>Central Bank of Denver v. First Interstate Bank of Denver</u>, 511 U.S. 164, 183 (1994), which held that a private plaintiff may not maintain an action for aiding and abetting violations of Section 10(b) of the Exchange Act, although the SEC may.  <u>See generally</u> S. Rep. No. 98, 104th Cong. (1995).

Our Court of Appeals has not had occasion to address aiding and abetting liability under Section 20(e) in particular.  Both parties agree that the general standard requires that a plaintiff prove three elements to establish liability for aiding and abetting a violation of the Exchange Act.  First, a principal must commit a

---

[5]Section 20(e) of the Exchange Act provides that a person who "knowingly provides substantial assistance to another person in violation of a provision of [the Exchange Act] . . . shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."

primary violation.  Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000).[6]  Second, the aider and abettor must provide "substantial assistance" to the primary violator.  Id.  Third, the aider and abettor must act with the requisite scienter.  Id.[7]

The parties strongly disagree, however, over what the "requisite scienter" is under Section 20(e).  The SEC relies heavily on two cases from this Circuit, Graham v. SEC, 222 F.3d at 1000, and Howard v. SEC, 376 F.3d 1136 (D.C. Cir. 2004), to argue that the requisite standard is knowledge or, at a minimum, extreme recklessness.  Those cases and their reasoning are distinguishable for the following reasons.

First, and most importantly, neither case addresses the new section of the Exchange Act at issue in this case.[8]  Both of those cases were brought as administrative actions pursuant to Section 15 and/or Section 21B of the Exchange Act.  15 U.S.C. § 78o-b(4)(E); 15 U.S.C. § 78u-2(a)(2).  These sections set forth a different scienter requirement, namely a "willful" standard, which is less burdensome than the "knowingly" standard imposed by Congress in

---

[6]Defendant does not contest the existence of a primary violation in his Motion.

[7]Both parties agree that the general standard in this Circuit for aiding and abetting liability accords with the language of the statute.  Mot. at 5; Opp. at 15.

[8]Nor does the Court of Appeals's recent decision in Dolphin & Bradbury, Inc. v. SEC, which addressed the relevant scienter standard for primary violations of Section 10(b) and Rule 10b-5. No. 06-1319, slip op. at 5-6 (D.C. Cir. Jan. 11, 2008).

Section 20(e).  See Howard, 376 F.3d at 1142 n.6 (noting that Howard's exposure to aiding and abetting liability was predicated on Section 15(b) and Section 21B); Graham, 222 F.3d at 994 ("Graham was charged with willfully aiding and abetting Broumas' violations").

Second, the statute itself explicitly defines "knowingly" as requiring "actual knowledge," and does not allow mere recklessness or extreme recklessness to suffice.  15 U.S.C. § 78u-4(f)(10)(A).

Third, it is certainly true, as the SEC argues, that prior to Central Bank and passage of the PSLRA, the law was very clear in this Circuit that Section 10(b) could be construed to imply aiding and abetting liability, and that the scienter requirement implied under that section was a "knowing" or "extremely reckless" standard.  See SEC v. Steadman, 967 F.2d 636, 641 (D.C. Cir. 1992) ("we have determined, along with a number of other circuits, that extreme recklessness may also satisfy this intent requirement"). In Graham, which, again, did not involve the statutory provision at issue here, our Court of Appeals affirmed that there are still three principal elements required to establish general liability for aiding and abetting under the Exchange Act and that they are the same three elements which existed prior to Central Bank and enactment of the PSLRA:  namely, a primary violation, substantial assistance, and the requisite scienter.  222 F.3d at 1000.

Although Graham re-affirmed the general applicability of the

three elements for aiding and abetting under the Exchange Act, the Court of Appeals did not have the opportunity to address the issue of scienter as it arises under Section 20(e).  In setting forth the elements of aiding and abetting, however, Graham relied in part upon SEC v. Fehn, 97 F.3d 1276, 1287-88 (9th Cir. 1996).  Fehn, at the pages cited by our Court of Appeals in Graham, noted that in enacting the new statute, Congress used language "identical to that used by lower federal courts in articulating the elements of aiding and abetting under Section 10(b) before Central Bank eliminated private causes of action for aiding and abetting."  Id. at 1288 (emphasis added as to "elements," emphasis in original as to "before").

In Fehn, the Ninth Circuit directly addressed the proper scienter standard to be applied under Section 20(e).  Prior to Central Bank, the Ninth Circuit used both the standard our Circuit used pre-Central Bank (i.e., "knowing" or "extreme recklessness"), as well a narrower standard requiring actual knowledge.  See Fehn, 97 F.3d at 1288 n.11 ("We acknowledge that other decisions by this Court have defined this element as "actual knowledge or reckless disregard.").  However, Fehn acknowledged that despite a pre-Central Bank divergence of views within its own Circuit on whether a "knowing" or "reckless" standard applied, any such divergence of views would have to give way to the plain language of the PSLRA, which used the word "knowingly."  Id.  Fehn went on to

-18-

observe that the legislative history relating to passage of this provision bolsters that conclusion. Id. at 1288.

Judge Cote of the United States District Court for the Southern District of New York also has recognized the significance of Congress's choice of the word "knowingly," and accordingly rejected the SEC's proffered construction of the term to include "recklessly." SEC v. KPMG LLP, 412 F. Supp. 2d 349, 382-83 (S.D.N.Y. 2006). Noting that the PSLRA explicitly defined "knowingly," Judge Cote reasoned that

> the fact that the [word] "knowingly" was defined as actual knowledge in the very same bill that contained Section 20(e) weighs in favor of the defendants' contention that the provision does not encompass recklessness. "[I]dentical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995) (citation omitted).

Id.

In sum, the Court concludes that recently enacted statutory language must supercede any pre-existing common law interpretations of the proper scienter standard. See City of Milwaukee v. Illinois, 451 U.S. 304, 316-17 (1981) ("we start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law") (quotations omitted). Therefore, for all the reasons stated, the "knowing" standard should be applied to the alleged violations of Section 20(e). The totality of the evidence will now be examined to determine whether summary judgment is warranted

under that standard.[9]

**A.     Summary Judgment Is Denied as to Count III (Aiding and Abetting PurchasePro's Alleged Violations of Section 10(b) and Rule 10b-5, by Employing a Manipulative or Deceptive Device or Contrivance in Contravention of SEC Rules and Regulations).**

The SEC alleges that Wakeford knowingly or recklessly[10] provided substantial assistance to PurchasePro's primary Rule 10b-5 violation: the inclusion of $3.65 million in AuctioNet revenue in the April 26, 2001 analyst call and associated press release. Wakeford argues that he did not know about the scheme to pay PurchasePro $3.7 million[11] and that his actions were not the proximate cause of any primary securities violation.[12]   Therefore,

---

[9]See SEC v. Boling, 2007 WL 2059744, *4 n.1 (D.D.C. Jul. 13, 2007) ("the inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard") (citation omitted).

[10]As discussed above, although the SEC alleges that Wakeford "knowingly or recklessly" aided and abetted securities violations, the Court will analyze the SEC's arguments using the "knowing" standard.

[11]It will be remembered that the Statement of Work set forth a total obligation of $3.7 million: $3.65 million for integration work and $50,000 for "professional services."

[12]The parties both state that "substantial assistance" requires a showing that the aider and abettor was a proximate cause of the statutory violation, citing case law from the Southern District of New York.  See, e.g., SEC v. Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006).  Our Court of Appeals has not expressly adopted this formulation of the "substantial assistance" requirement. See Graham, 222 F.3d at 1000.  Nevertheless, the SEC has provided sufficient evidence to raise a genuine dispute of material fact under either standard.

he concludes, summary judgment is warranted with respect to the aiding and abetting claims brought against him.  Def. Kent Wakeford's Mot. for Summ. J.("Mot.") at 9, 14.  Given the testimony of various witnesses, including  Wakeford himself, and looking at the evidence as  a whole, it is clear that a genuine dispute of material fact exists as to whether Wakeford knowingly aided and abetted PurchasePro's alleged intentional misstatement of its First Quarter 2001 earnings.

> **1.   A Genuine Dispute of Material Fact Exists as to Whether Wakeford Knew that PurchasePro was Engaged in a Scheme to Fraudulently Include an Additional $3.65 Million in First Quarter 2001 Revenue.**

As discussed above, the SEC must prove three elements to establish liability for aiding and abetting a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  First, a principal must commit a primary violation.  Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000). Second, the aider and abettor must provide "substantial assistance" to the primary violator.  Id.  Third, the aider and abettor must act with the requisite scienter.  Id.; Fehn, 97 F.3d at 1288 n.11.

Because the SEC has demonstrated that a genuine issue of material fact exists as to whether Wakeford's alleged assistance in PurchasePro's primary violation was "knowing," summary judgment must be **denied.**

First, there is evidence in the record that Wakeford knowingly initiated a scheme to claim revenue prematurely through creation of

a Statement of Work.  Wakeford does not contest that prior to his suggestion to Charles Johnson, Jr. that PurchasePro could include AOL revenues in its First Quarter 2001 earnings projections, PurchasePro had no plans to include revenue from the AuctioNet integration in its First Quarter revenue figures, and that it was only after he introduced the notion to Johnson that the $3.65 million scheme was formed.

Wakeford argues that PurchasePro could have properly accounted for some AuctioNet revenue in the First Quarter, as he suggested, and therefore that there is no admissible evidence of the requisite scienter on his part.  However, Wakeford's current position that some revenue recognition was proper is contradicted by notes recording Wakeford's earlier statements on the matter.[13]  In those

---

[13]Wakeford contends that the SEC impermissibly relies upon facts from the notes and deposition testimony of various attorneys who conducted an internal investigation of AOL in the wake of PurchasePro's unfounded claim for payment of $3.65 million.  Over the course of this investigation, Wilmer Cutler Pickering attorneys, outside counsel for AOL, interviewed Wakeford and Defendant John Tuli and recorded their statements in memoranda to the "AOL/PurchasePro Inquiry File".  Wakeford argues that such notes are inadmissible hearsay, and therefore cannot be relied upon to defeat summary judgment.  The SEC's Statement of Facts indicates that it might seek to introduce these notes at trial as a "past recollection recorded."

While it is true that only evidence that is admissible at trial may be used to oppose a motion for summary judgment, it is also true that "a nonmovant is not required to produce evidence in a _form_ that would be admissible at trial," so long as the evidence is "capable of being converted into admissible evidence."  Gleklen v. Democratic Cong. Campaign Comm., 199 F.3d 1365, 1369 (D.C. Cir. 2000) (emphasis in original).  Even assuming _arguendo_ that Wakeford's argument is correct that the attorneys' notes are

notes, he indicated that he "felt uncomfortable that [PurchasePro] was stretching the accounting rules" by booking all of the AuctioNet revenue up front as an integration fee.   Wakeford Interview at 7.  Testimony regarding Wakeford's admitted discomfort about "stretching the accounting rules," as well as his concession that there was no basis for an AOL obligation to pay PurchasePro $3.65 million,[14] provides sufficient evidence that his suggestion that PurchasePro account for AuctioNet revenue up front was made with knowledge that such accounting was impermissible. Consequently, a genuine dispute of material fact exists as to whether Wakeford knowingly initiated and participated in the scheme to improperly claim AuctioNet revenue in the First Quarter.

Second, although Wakeford claims that he had no knowledge of the creation of the fraudulent Statement of Work or of its $3.65 million figure, testimony from several SEC witnesses demonstrates that a genuine dispute of material fact exists as to whether he knowingly assisted in the creation of the fraudulent SOW and in PurchasePro's improper claim of First Quarter revenue.

For instance, Anderson has testified that during a telephone conversation near the end of March 2001, Wakeford suggested that

---

inadmissible, there is no definitive indication that the SEC would be unable to convert these notes into admissible evidence at trial. Therefore, excluding these notes from consideration at this time would be improper, particularly where, as here, motions <u>in limine</u> on this subject are pending.

[14]Wakeford Dep. at 88:16-89:3.

PurchasePro could recognize AuctioNet-related revenue if it submitted "a statement of work to AOL that matched or was consistent with a master services agreement already in place between the two companies." Pl.'s Statement of Facts, Ex. 16 (<u>United States v. Benyo</u> Trial Transcript, Nov. 20, 2006) ("Anderson Tr.")) at 2605-06. According to Anderson, creation of an SOW was Wakeford's idea.

Wakeford attempts to rebut Anderson's testimony by arguing that because he did not provide the $3.65 million figure to Anderson, there is no evidence that he knowingly participated in an attempt to fraudulently claim <u>$3.65 million</u> in the First Quarter of 2001. Reply at 8-9. However, Geoff Layne testified that Wakeford knew the exact dollar amount prior to completion of the SOW, and continued to assist in the scheme. Layne testified that he told Wakeford he needed the soft copy of AOL's agreement with AuctioNet so that he could "put together a statement of work so we could recognize 3.65 million in revenue for integration work." <u>See</u> Layne Trial Testimony at 1296.

Thus, there is evidence indicating that Wakeford <u>knew</u> that this number was not accurate, but continued to assist the scheme anyway. Wakeford has testified that he was very familiar with the AOL-PurchasePro agreements and that there was "no basis in [the

AOL-PurchasePro] agreements to pay [PurchasePro] $3.65 million."[15]
Wakeford Dep. at 88:16-89:3.   Nevertheless, Wakeford responded to
Layne's alleged request for documentation to support a claim for
just that amount by providing the requested document.   While there
is no evidence that Wakeford knew he was aiding a forgery, Layne's
testimony provides sufficient evidence that Wakeford knew he was
assisting in the creation of a SOW fraudulently documenting a $3.65
million obligation from AOL to PurchasePro.[16]

Third, Wakeford's response to Anderson's April 23, 2001
request for confirmation of a future wire transfer of $3.65 million
for "auctionet integration" of "still working it," further raises

---

[15]In  his  deposition  testimony,  Wakeford  noted  a  gross
obligation  of  $4 million  from  AOL  to  PurchasePro  and  a  net
obligation  of  $3.2 million  after  AOL's  commission  was  subtracted,
but could not explain where PurchasePro would have gotten the $3.65
million figure.   It was his testimony at that time that the maximum
revenue AOL was obligated to pay PurchasePro under the AuctioNet
agreements was $3.2 million.   Wakeford Dep. at 85-89.

[16]Defendant  argues  that  the  Court  must  "look  beyond"  the
various testimonial excerpts quoted by the SEC and instead look at
the context of the conversations referenced.   See Reply at 6.   In
the summary judgment context, however, the Court "must draw all
reasonable inferences in favor of the nonmoving party, and it may
not  make  credibility  determinations  or  weigh  the  evidence."
Reeves,  530 U.S.  at 150.   Wakeford's  request  that  the  Court
scrutinize the context of witness testimony provides only further
evidence  that  there  are  genuine  disputes  of  material  fact.
Questions with respect to what may have been said or what meaning
may have been intended are reserved for the jury.   It is not the
Court's role to make credibility determinations, or assess motive
or knowledge, particularly in the summary judgment context.   Id.;
see also Weidel v. Ashcroft, 234 F. Supp. 2d 5, 8 (D.D.C. 2002)
("federal courts have persistently indicated that questions of
motive and intent cannot be resolved on summary judgment").

a genuine dispute of material fact as to whether he had the required scienter. Pl.'s Statement of Facts, Ex. 75, 76. Wakeford contends that his response was based on a mistaken understanding that Anderson was referencing an earlier PurchasePro request for advance payment of the outstanding balance owed under the AuctioNet Agreements. Reply at 11. However, Wakeford gave deposition testimony that he understood that the AuctioNet agreements provided no basis for an AOL obligation to pay PurchasePro $3.65 million. See Wakeford Dep. at 88:16-89:3. Thus, it appears clear that a genuine dispute of material fact exists as to whether Wakeford's response to Anderson that he was "still working it" was a prelude to a knowing attempt to engage in a fraudulent transfer of funds, or merely a misunderstanding of the question Anderson posed.

The evidence discussed demonstrates that there is a genuine dispute of material fact over whether Wakeford knowingly assisted in the scheme to post $3.65 million to PurchasePro's books in the First Quarter, and therefore whether Wakeford possessed the requisite scienter to aid and abet PurchasePro's alleged violations of Section 10(b) and Rule 10b-5.[17]

---

[17]It should be remembered that the test for determining whether the dispute is "genuine" is whether "a reasonable jury could return a verdict for the non-moving party." Arrington, 473 F.3d at 333, quoting Liberty Lobby, 477 U.S. at 248.

2.   **A Genuine Dispute of Material Fact Exists as to Whether Wakeford Substantially Assisted PurchasePro in a Scheme to Fraudulently Include an Additional $3.65 Million in First Quarter 2001 Revenue.**

The evidence also indicates that a genuine dispute of material fact exists as to whether the conduct described above "substantially assisted" a primary violation. <u>Graham</u>, 222 F.3d at 1000 (D.C. Cir. 2000). To constitute "substantial assistance," the primary violations must be a "direct or reasonably foreseeable result" of the aider and abettor's conduct. <u>Fraternity Fund Ltd. v. Beacon Hill Asset Mgt., LLC</u>, 479 F. Supp. 2d 349, 371 (S.D.N.Y. 2007). In other words, it is necessary that the defendant "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, and that he seek by his action to make it succeed." <u>Zoelsch v. Arthur Andersen & Co.</u>, 824 F.2d 27, 36 (D.C. Cir. 1987) (quoting <u>Nye & Nissen v. United States</u>, 336 U.S. 613, 619 (1949)).

A genuine dispute of material fact exists as to whether PurchasePro's violations were a direct or reasonably foreseeable result of Wakeford's conduct. As discussed above, Wakeford concedes that PurchasePro's projection of First Quarter 2001 revenues did not include any revenue from the AuctioNet transaction until Wakeford suggested its inclusion to Johnson. Reply at 8. There also is evidence indicating that Wakeford's suggestion that PurchasePro claim AuctioNet revenue in the First Quarter came on the heels of pointed requests by PurchasePro for additional revenue

-27-

from AOL.  <u>See</u> Pl.'s Statement of Facts, Ex. 61 (Mar. 28, 2001 e-mail from Anderson to Wakeford); Wakeford Interview at 3 ("[Charles Johnson] Junior was frantic for sales.").  Drawing all reasonable inferences in favor of the nonmoving party, a reasonable fact finder could conclude that Wakeford suggested creation of the fraudulent Statement of Work for the express purpose of misleading the public regarding PurchasePro's First Quarter performance; in other words, the misstatement of PurchasePro's First Quarter profits would have been "reasonably foreseeable" by him.

Moreover, the SEC has presented evidence that in addition to his alleged role in initiating the scheme, Wakeford facilitated confirmation of the fictitious SOW by instructing Tuli to certify to PurchasePro auditors the validity of the $3.65 million obligation.  Even assuming the truth of Wakeford's assertion that he did not read the confirmation request Tuli received from PurchasePro and forwarded to him, there is evidence that even though Wakeford knew the work required under the SOW had not been completed, he nevertheless instructed Tuli to certify to PurchasePro auditors that it had been.  Tuli Interview at 1.  Wakeford also allegedly arranged with PurchasePro for Tuli to be the AOL official who confirmed orally to the auditors on or about April 25, 2001 that the "auctionet integration" work was completed by the end of Q1 2001.  Opp. at 29.

Tuli's confirmation of the validity of the SOW and its

underlying obligation allegedly was relied upon by the auditors in their review and by PurchasePro in creating its First Quarter figures, and therefore substantially assisted PurchasePro in its primary Section 10(b) violation.  Drawing all reasonable inferences in favor of the SEC, the evidence demonstrates that a genuine dispute of material fact exists as to whether Wakeford knowingly associated himself with PurchasePro's attempts to fraudulently claim additional First Quarter revenue and sought "by his action to make it succeed."  <u>Zoelsch</u>, 824 F.2d at 36.

Because the SEC can show genuine issues of material fact regarding Wakeford's role in aiding and abetting violations of Section 10(b) and Rule 10b-5, Wakeford's motion for summary judgment on Count III is **denied.**

**B.    Summary Judgment Is Denied as to Count V (Aiding and Abetting PurchasePro Officers' Alleged Violations of Section 13(b)(5) and Rule 13b2-1, by Falsifying Books and Records and Circumventing Internal Controls).**

Count V alleges that Wakeford aided and abetted the violations by PurchasePro and certain PurchasePro officers of Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, by circumventing PurchasePro's internal controls and falsifying its books and records.

As discussed above, the SEC has presented evidence that Wakeford knowingly initiated the creation of a fraudulent Statement of Work, provided documents to assist in that SOW's creation, and instructed Tuli to provide confirmations that substantially

-29-

assisted the plan of certain PurchasePro officers to deceive Arthur
Andersen about the extent of integration work that had occurred in
the First Quarter.  In light of this evidence, the SEC has raised
a genuine dispute of material fact as to whether Wakeford aided and
abetted primary violations of Section 13(b)(5).

Accordingly, Wakeford's motion for summary judgment on Count
V is **denied**.

**C.** **Summary Judgment Is Denied as to Count VII (Aiding and
Abetting PurchasePro Officers' Alleged Violations of Rule
13b2-2, by Misleading an Accountant or Auditor).**

Count VII alleges that Wakeford aided and abetted PurchasePro
officers in misleading an auditor, and thereby violated Rule 13b2-
2, 17 C.F.R. § 240.13b2-2, which prohibits making or causing to be
made a materially false or misleading statement to an accountant in
connection with an audit.

Here, too, the SEC has presented evidence of a genuine dispute
of material fact.  During the course of its audit, Arthur Andersen
relied on the SOW.  The SEC has presented evidence that Wakeford
suggested and assisted in its creation.  Moreover, the SEC has
presented evidence that Wakeford enlisted Tuli in the scheme by
instructing him to sign documents certifying falsely that the work
required under the SOW for payment of the $3.65 million had been
completed.  Wakeford also instructed Tuli to participate in a
confirmatory conference call with the PurchasePro auditors and,
like Tuli, received the e-mail from Layne with the auditors'

questions and the "correct" answers to those questions.  Layne Tr. at 4851; Pl.'s Statement of Facts, Ex. 54.

Because the SEC has shown a genuine issue of material fact regarding Wakeford's role in aiding and abetting the deception of Arthur Andersen, Wakeford's motion for summary judgment on Count VII is **denied.**

> **D.  Summary Judgment Is Denied as to Count IX (Aiding and Abetting PurchasePro's Falsification of Books and Records and Circumvention of Internal Controls)**

To establish liability for aiding and abetting a violation of Exchange Act Sections 13(b)(2)(A) and (B), 15 U.S.C. § 78m(b)(2)(A) and (B), the SEC must prove (1) that PurchasePro committed a primary violation; (2) that Wakeford substantially assisted the violation; and (3) that he acted with the requisite scienter. Ponce v. SEC, 345 F.3d 722, 737 (9th Cir. 2003); see also Section III, supra, at 15-19 (discussing the scienter standard set forth under Section 20(e) for aiding and abetting securities violations).

For the same reasons as discussed in Sections A through C, the SEC has presented evidence of a genuine dispute of material fact as to whether Wakeford knowingly aided and abetted PurchasePro's falsification of books and records and circumvention of internal controls.  Despite recognizing that AOL had no obligation to PurchasePro in the amount of $3.65 million, Wakeford allegedly assisted in the creation of the fraudulent SOW and instructed his subordinate to provide necessary confirmations to the auditors

regarding that document.

Therefore, Wakeford's motion for summary judgment on Count IX is **denied.**

IV.   **CONCLUSION**

For the reasons set forth above, Defendant Wakeford's Motion for  Summary Judgment [**Dkt. No. 177**] is **denied.**   An Order shall issue with this Memorandum Opinion.


/s/_____
January 16, 2007                    Gladys Kessler
                                    United States District Judge


**Copies to: Attorneys of record via ECF**