## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMM'N, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 05-36 (GK) |
| | ) |
| CHARLES JOHNSON, JR., <u>et al.</u>, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Securities and Exchange Commission ("SEC") brings this action against four individual Defendants (John Tuli, Kent Wakeford, Christopher Benyo, and Michael Kennedy, collectively "Defendants") alleging a fraudulent scheme to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc. ("PurchasePro"). This matter is before the Court on Defendant Tuli's Motion for Summary Judgment [**Dkt. No. 180**]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendant Tuli's Motion for Summary Judgment is **denied.**

I.    **BACKGROUND**[1]

A.    **The Defendants' Alleged Scheme**

The Defendants in this case are former executives of both PurchasePro, a publicly traded Internet company that provided a business-to-business internet marketplace, and America Online, Inc. ("AOL").

Starting in December 2000, PurchasePro, AOL, and a third company, AuctioNet, which provided Internet auction services, entered into a series of agreements that required integration of AuctioNet into the websites of PurchasePro and AOL NetBusiness. According to the SEC, the agreements required a complex series of payments amongst the three companies.  AOL was to receive $5 million from AuctioNet, keep $1 million for itself, and then pay the remainder (less a 20% commission) to PurchasePro after AOL received the funds.  The SEC claims that AOL would begin to pay the net amount of $3.2 million to PurchasePro in quarterly installments beginning April 1, 2001.

The SEC alleges that the Defendants developed a scheme to recognize the revenue from these agreements in the First Quarter of 2001.  At the heart of the scheme was an allegedly sham Statement of Work between PurchasePro and AOL ("SOW") that would supposedly reflect that the integration work had occurred in the First

---

[1]  Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Material Facts submitted pursuant to Local Civil Rule 7(h).

Quarter, when it fact it had not.   The SOW would be used to convince PurchasePro's auditors, Arthur Andersen, that PurchasePro could recognize $3.65 million in revenue in the First Quarter of 2001.[2]

It is undisputed that the SOW was not finalized until after the First Quarter had ended.   It is also undisputed that PurchasePro Executive Vice President Geoff Layne and his assistant, James Sholeff, forged the signature of AOL officer Eric Keller on the SOW and that at some point, the SOW was also backdated to a date in the First Quarter.   However, the parties fiercely dispute the actual meaning of the SOW's terms.   The Defendants contend that sufficient integration work occurred in the First Quarter to meet the requirements set forth in the SOW.   The SEC responds that the SOW required integration work that was not completed in the First Quarter.

PurchasePro's outside auditor, Arthur Andersen, began to review PurchasePro's First Quarter revenue shortly after the end of the quarter.   The forged and backdated SOW was eventually provided to Arthur Andersen, which placed the document in its files and allegedly relied on it during the course of its audit.   Several of the Defendants, as well as Matthew Sorensen, a PurchasePro

---

[2] The $3.65 million figure stated in the SOW is distinct from the $3.2 million that the existing agreements required AOL to pay PurchasePro.   The record is unclear regarding the origins and components of the $3.65 million figure.

employee, allegedly made additional deceptive and misleading statements to the auditors regarding the recognition of revenue from the AuctioNet transaction.

On April 26, 2001, PurchasePro executives conducted a conference call with Wall Street analysts, PurchasePro shareholders, and others regarding its First Quarter revenues. The $3.65 million from the AuctioNet transaction was included in the revenues announced during the call. Jim Clough, PurchasePro's interim Chief Financial Officer, announced on the call that "[i]t's important to note that a full two-thirds of our revenue for the quarter was AOL-related.  It includes . . . $3.7 million in integration services . . . .  We apply a heightened degree of scrutiny to this revenue given the unique multi-element relationship we have with them."  Pl.'s Statement of Facts, Ex. 27 (PurchasePro.com First Quarter Conference Call Transcript, Apr. 26, 2001) at 3.  The $3.65 million from the AuctioNet transaction represented 12% of PurchasePro's reported First Quarter revenue.

PurchasePro also released a press release on April 26, 2001 announcing its earnings, which included the $3.65 million in revenue from the AuctioNet transaction.  Arthur Andersen did not review this press release prior to its release.

On May 14, 2001, AOL sent a letter to PurchasePro stating that it could not confirm the existence of the SOW.  PurchasePro, with the agreement of Arthur Andersen, subsequently decided that the

$3.65 million from the AuctioNet transaction should not have been included in PurchasePro's quarterly revenues.  Accordingly, this revenue was not included in the Form 10-Q PurchasePro filed with the SEC on May 29, 2001.

### B.    Tuli's Alleged Role in the Scheme

Defendant John Tuli was Vice President of Business Development for NetScape, a division of AOL, during the relevant period.  The SEC alleges that Tuli violated section 20(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq. Specifically, the SEC alleges that Tuli aided and abetted PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 (Count III); aided and abetted certain PurchasePro officers' violations of Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 by falsifying books and records and circumventing internal controls (Count V); aided and abetted certain PurchasePro officers' violations of Rule 13b2-2 by misleading an accountant or auditor (Count VII); and aided and abetted PurchasePro's violations of Exchange Act Sections 13(b)(2)(A) and (B), 15 U.S.C. § 78m(b)(2)(A) and (B), by falsifying books and records (Count IX).

The SEC does not allege that Tuli assisted in formulating the scheme that would allow PurchasePro to wrongfully book revenue in the First Quarter, but does allege that Tuli assisted in creating the fraudulent Statement of Work and provided false confirmation to

PurchasePro's auditors that the work required under the SOW had been completed in the First Quarter of 2001.  Pl.'s Mem. in Opp. to Def. Kent Wakeford's Mot. for Summ. J. ("Opp.") at  3-4.

On March 30, 2001, Tuli received an e-mail from Geoff Layne requesting his help in efforts to create a "Statement of Work between AOL and PPRO, so that [AOL] can pay [PurchasePro] the integration fees."  Pl.'s Statement of Facts, Ex. 32.  On Saturday, March 31, 2001, Tuli responded to Layne's request by sending text for PurchasePro to use in drafting the SOW, stating, "adjust this as needed."  Pl.'s Statement of Facts, Ex. 36.  The text had been drafted by Tuli's subordinate, Eric Baxley, at Tuli's request.  Id. Portions of the Baxley draft were used by Matthew Sorensen, PurchasePro's Senior Product Development Manager, in constructing the fraudulent SOW.  D.'s Statement of Facts ¶23.

The SEC contends that Tuli was aware that PurchasePro was having difficulty reaching its revenue goals for the First Quarter of 2001, and therefore that he knowingly assisted creation of the fraudulent SOW in order to establish a basis for recognizing certain revenues.  As evidence of this contention, the SEC notes that in mid-April, Tuli wrote an e-mail to a co-worker acknowledging that during the week of April 5, 2001, Wakeford, Charles Johnson, Jr., and another AOL employee had to "help [Johnson] make his numbers."  Pl.'s Statement of Facts, Ex. 68 (Apr. 18, 2001 e-mail from Tuli to "Bankoff").  Tuli said that

Wakeford had taken these steps "because we couldn't sell enough marketplaces despite best efforts." Id. Tuli had participated in "most deals," and recognized that the market at that time had made the promised marketplace sales difficult. Id.

On April 20, 2001, shortly before PurchasePro was scheduled to publicly announce its revenue for the First Quarter of 2001, a PurchasePro employee contacted Tuli by e-mail, copying Benyo and James Sholeff, Geoff Layne's assistant. Pl.'s Statement of Facts, Ex. 85 (Apr. 20, 2001 e-mail from Barry Joyce to Tuli). The e-mail included a copy of the final SOW and a letter to Tuli requesting acknowledgment of completion of the work required under the SOW. Id. Although the e-mail was sent on April 20, 2001, the attached letter bore a March 26, 2001 date. Id. The letter also included a blank line for Tuli to sign to certify completion of the work. Id.

> The acknowledgment letter stated that
>
> PurchasePro has completed the integration of AuctioNet's auction application within the NetBusiness Marketplace. Integration services completed are as stated in the Statement of Work dated February 5, 2001 between AOL and PurchasePro. AOL acknowledges this letter as acceptance of the aforementioned deliverable in accordance with our SOW.

The SOW attached to the April 20, 2001 e-mail included a description of the services to be performed and the price for those services: $3.65 million.

At some point on April 20, 2001, PurchasePro sent Tuli a

different draft letter to be signed by AOL to certify completion of the work required by the SOW.  This second draft, which Tuli ultimately signed, acknowledged that "all work covered under the Statement of Work dated February 5, 2001 was completed and accepted as of March 30, 2001."  Pl.'s Statement of Facts, Ex. 51 at 2.

Tuli allegedly directed his subordinate, Eric Baxley, to sign the second draft "right away" and fax it to Scott Miller, PurchasePro's Chief Accounting Officer.  Pl.'s Statement of Facts, Ex. 4 (Jun. 15, 2007 dep. of Eric Baxley ("Baxley Dep.")) at 73-79. Tuli dictated the language of the second draft to Baxley and indicated that it needed to be on AOL letterhead.  Id.  Baxley complied with Tuli's direction.  Id.  However, Baxley was not sufficiently senior to provide the certification needed by Arthur Andersen, and therefore Tuli's signature was sought by PurchasePro employees.

Tuli forwarded a copy of the second draft to Wakeford in an e-mail that stated, "Urgent-Auctionet," and "[w]hat am I signing for Ppro auditors? . . . . Should I sign this?"  Pl.'s Statement of Facts, Ex. 53 (Apr. 20, 2001 e-mail chain, including e-mail from Tuli to Wakeford); Pl.'s Statement of Facts, Ex. 13 (Tuli Aug. 30, 2007 Dep. ("Tuli Dep.")) at 87.  Tuli was being pressured by Johnson to sign the letter immediately.  Pl.'s Statement of Facts, Ex. 53.  Tuli spoke with Wakeford about the certification, and the SEC alleges that Wakeford either asked Tuli to check if some of the

-8-

work had been done, or asked Tuli if he had already checked on whether the work was completed.  Tuli replied that the work was proceeding, that AuctioNet was happy with it, but that the work had not been fully completed.  Pl.'s Statement of Facts, Ex. 73 (May 10, 2001 Riewe memo recording May 10, 2001 Tuli Interview ("Tuli Interview")) at 1.  Wakeford told Tuli he could sign the letter. Id. at 1.

Tuli signed the acknowledgment that was the second draft on April 20, 2001 and provided Wakeford a copy of the document.  Tuli Dep. at 95-96.  The letter was faxed to PurchasePro Chief Accounting Officer Scott Miller with a cover page stating that it was "From: Kent Wakeford."  Pl.'s Statement of Facts, Ex. 51 (Apr. 20, 2001 fax from Wakeford to Miller).

Tuli's confirmation letter was part of the documentation used by PurchasePro to justify the transaction to PurchasePro's auditors.  Pl.'s Statement of Facts, Ex. 22 (United States v. Benyo Trial Transcript, Dec. 20, 2006 trial test. of Shawn McGhee, PurchasePro President) at 6334.  The SEC contends that it was relied upon both by Arthur Andersen in its review of SOW revenues and by PurchasePro senior management in its decision about what revenue to include in the April 26, 2001 earnings announcement. Pl.'s Statement of Facts ¶14(g).

Arthur Andersen sought further confirmation of the obligations detailed in the SOW via a conference call.  Layne contacted

Wakeford about who at AOL the auditors should speak with, and Wakeford directed him to Tuli.  Tuli contacted Layne prior to the call and allegedly asked him what questions the auditors would ask and what the correct answers were.  Pl.'s Statement of Facts, Ex. 20 (United States v. Benyo Trial Transcript, Dec. 6, 7, & 11, 2006) ("Layne Tr.")) at 4851.

On April 24, 2001, Layne sent an e-mail to Tuli, copying Wakeford, and providing a list of auditor questions and "our answers."  Pl.'s Statement of Facts, Ex. 54.  Among other things, Layne's e-mail informed Tuli that he would be asked (1) whether the AuctioNet integration work was completed during the First Quarter of 2001, and (2) whether any work was required after the First Quarter.  Layne's e-mail indicated that the answers to those questions were, respectively, (1) "yes," and (2) "no."

Arthur Andersen auditor Larry Krause conducted the call on April 26, 2001, during which Tuli confirmed that all work covered under the SOW had been completed by the end of the First Quarter 2001.  Layne Tr. at 4670.  A few weeks after the Arthur Andersen call, Tuli allegedly admitted to a co-worker that during the call he had told PurchasePro's auditors that the work they were asking about was finished, even though in fact it was not.  Pl.'s Statement of Facts, Ex. 18 (United States v. Benyo Trial Transcript, Nov. 6, 16, 2006) ("Farrell Tr.")) at 1983-84; 2417.

**C.    Procedural History**

The Government brought both criminal and civil cases against the Defendants.  This civil case was stayed from November 9, 2005 until March 13, 2007, during which Defendants Wakeford, Tuli, and Benyo were tried and acquitted in the Federal District Court for the Eastern District of Virginia.  The charges against Defendant Kennedy were voluntarily dismissed by the Government.  A mistrial was declared as to the fifth Defendant, Charles Johnson, Jr.  His retrial began October 9, 2007 and Judge Walter DeKalb Kelley, Jr. of the Eastern District of Virginia has the case under advisement.  Scott Wiegand, PurchasePro's General Counsel, was acquitted following a bench trial in December 2005.

Upon completion of the criminal cases of the four Defendants, the stay in this civil case was lifted as to four of the Defendants (Wakeford, Tuli, Kennedy, and Benyo) but not as to Defendant Johnson, Jr.  After their acquittals, the four Defendants were extremely anxious to schedule an early trial in this case in the hope that they would be able to clear their names completely and resume normal lives.  For that reason, and because of the age of the case, on May 7, 2007, this Court entered a Scheduling Order with very short deadlines.  On July 13, 2007, at the request of the SEC, and over the objection of the Defendants, the Court extended discovery for one month until August 30, 2007.  Numerous depositions were held during the discovery period, and counsel on

all sides worked diligently to complete discovery during that period.  In accordance with the Scheduling Order, summary judgment motions were filed by the Defendants on October 10, 2007.  On December 18, 2007, trial was continued as to Defendant Tuli until July 7, 2008, with the consent of the SEC.

## II.  STANDARD OF REVIEW

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006).  In other words, the moving party must satisfy two requirements:  first, demonstrate that there is no "genuine" factual dispute and, second, that if there is it is "material" to the case.  "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  Arrington, 473 F.3d at 333, quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it might affect the outcome of the case under the substantive governing law.  Liberty Lobby, 477 U.S. at 248.

In its most recent discussion of summary judgment, in Scott v. Harris, __ U.S. __, 127 S.Ct. 1769, 1776 (2007), the Supreme Court said,

[a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 . . . (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

Liberty Lobby, 477 U.S. at 247-48.

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 248, 249. In both Liberty Lobby and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. Liberty Lobby, 477 U.S. at 255.

In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "[t]he non-moving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).

"To survive a motion for summary judgment, the party bearing the burden of proof at trial . . . must provide evidence showing that there is a triable issue as to an element essential to that party's claim." <u>Arrington</u>, 473 F.3d at 335[3]; <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).   "[I]f the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary judgment is improper."   <u>United States v. Philip Morris</u>, 316 F. Supp. 2d 13, 16 (D.D.C. 2004) (quoting <u>Greenberg v. FDA</u>, 803 F.2d 1213, 1216 (D.C. Cir. 1986)).

## III. **ANALYSIS**

The SEC alleges that Tuli knowingly or recklessly[4] provided substantial assistance to various primary securities violations,[5]

---

[3]It should be noted that a non-movant's affidavit may suffice to defeat a summary judgment motion if the parties' sworn statements are materially different. <u>Greene v. Dalton</u>, 164 F.3d 671, 674-75 (D.C. Cir. 1999); <u>Arrington</u>, 473 F.3d at 337.

[4]The SEC alleges that Tuli "knowingly or recklessly" aided and abetted securities violations.   The SEC's arguments will be analyzed under the correct "knowing" standard for aiding and abetting violations. <u>See</u> the Court's Op. Den. Wakeford's Mot. for Summ. J. at 15-19.   The SEC also intermittently states that the requisite scienter for aiding and abetting liability is a "general awareness of wrongdoing." <u>See, e.g.</u>, Opp. at 33.   That statement reflects a misunderstanding of the applicable case law.

[5]The SEC alleges that Tuli aided and abetted PurchasePro's violations of Section 10(b) and Rule 10b-5, by employing a manipulative or deceptive device or contrivance in contravention of SEC rules and regulations; aided and abetted PurchasePro officers' violations of Section 13(b)(5) and Rule 13b2-1, by falsifying books and records and circumventing internal controls; aided and abetted PurchasePro officers' violations of Rule 13b2-2, by misleading an

-14-

which culminated in the inclusion of $3.65 million in AuctioNet revenue in the April 26, 2001 analyst call and accompanying press release.  Tuli argues that he did not know about the scheme to pay PurchasePro $3.7 million[6] and that his actions were not the proximate cause of any primary securities violation.[7]  Therefore, he concludes, summary judgment is warranted with respect to the various aiding and abetting claims brought against him.  Def. John Tuli's Mot. for Summ. J.("Mot.") at 9, 14.

The fatal weakness in Tuli's Motion for Summary Judgment is its premise that the SEC's interpretation of the evidence is not to be believed.  However, "if the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary judgment is improper."  Philip Morris, 316 F. Supp. 2d at 16.  Given the

accountant or auditor; and aided and abetted PurchasePro's falsification of books and records and circumvention of internal controls.  Because Defendant does not challenge the existence of a primary violation by PurchasePro or its executives in his Motion, its existence will be deemed uncontested.

[6]It will be remembered that the Statement of Work set forth a total obligation of $3.7 million: $3.65 million for integration work and $50,000 for "professional services."

[7]The parties both state that "substantial assistance" requires a showing that the aider and abettor was a proximate cause of the statutory violation, citing case law from the Southern District of New York.  See, e.g., SEC v. Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006).  Our Court of Appeals has not expressly adopted this formulation of the "substantial assistance" requirement. See Graham, 222 F.3d at 1000.  Nevertheless, the SEC has provided sufficient evidence to raise a genuine dispute of material fact under either standard.

testimony of various witnesses, including the statements of Tuli himself, and looking at the evidence as a whole,[8] it is clear that a genuine dispute of material fact exists as to whether Tuli knowingly aided and abetted the primary securities violations alleged.  The following facts are both material to the outcome of the case and the subject of genuine dispute.

**A.   A Genuine Dispute of Material Fact Exists as to Whether Tuli Believed the Work Required Under the Statement of Work Had Been Completed.**

The essence of Tuli's argument is that the Court should accept as true the representations he made to PurchasePro auditors and officers that the work required under the SOW had been completed, and therefore that he lacked the requisite scienter.

In the summary judgment context, however, the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves, 530 U.S. at 150.  Questions with respect to whether Tuli believed that his representations were accurate present classic credibility issues and are reserved for the jury.  As noted earlier, it is not the Court's role to make credibility determinations, or assess motive or knowledge, particularly in the summary judgment context.  Id.; see also Weidel v. Ashcroft, 234 F.

---

[8]See SEC v. Boling, 2007 WL 2059744, *4 n.1 (D.D.C. Jul. 13, 2007) ("the inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard") (citation omitted).

Supp. 2d 5, 8 (D.D.C. 2002) ("federal courts have persistently indicated that questions of motive and intent cannot be resolved on summary judgment").

Tuli contends that, as a matter of law, the work required under the Statement of Work for recognition of the AuctioNet-related revenue was actually completed in the First Quarter of 2001. Tuli argues that, on its face, the Statement of Work required completion of only one of the seven items listed in Article 4.1A, and that at least one of those items was completed. Therefore, he concludes, the Statement of Work had been satisfied, and consequently his statements to PurchasePro's auditors and officers certifying completion were "indisputably accurate." See Mot. at 4-24 (citing Republican Nat'l Comm. v. Taylor, 299 F.3d 887, 891 (D.C. Cir. 2002) (applying District of Columbia parol evidence rule)).

Notwithstanding Tuli's assertions to the contrary, a genuine dispute of fact exists regarding Tuli's understanding of the meaning of the SOW and whether the work required thereunder actually was completed by the end of First Quarter 2001.

First, Tuli's argument that his interpretation of the SOW is correct rests entirely on challenged witness testimony, and therefore squarely presents a genuine dispute of material fact. Tuli bases his argument for summary judgment on the "current" testimony, under oath, of both Matthew Sorensen, PurchasePro's

senior product development manager and the "author" of the SOW, and Larry Krause, the Arthur Andersen audit engagement partner responsible for leading the audit fieldwork at PurchasePro. Even were Tuli's characterization of these witnesses' "current" testimony accepted as accurate,[9] the fact that they have testified differently in the past, under oath, on this very issue demonstrates that their credibility as to which version is correct must be assessed by a jury. See D.'s Statement of Facts, Ex. 9 (United States v. Benyo trial test. of Larry Krause) at 6242 (testifying that during the April conference call with Tuli he sought and received confirmation that all seven bullet points were completed); Pl.'s Statement of Facts, Ex. 12 ( Jun. 26, 2007 Dep. of Matthew Sorensen) at 113-15, 127; 153 (stating that contemporaneous to his creation of the Statement of Work, he believed "full integration" was required, that such had not been completed as of March 31, 2001, and that, in fact, "there was a lot more to be done").

Tuli asks the Court to accept as true these witnesses' "current" testimony and to disregard their prior statements. Given the Court's obligation to "draw all reasonable inferences in favor of the nonmoving party" and "not make credibility determinations or weigh the evidence," Reeves, 530 U.S. at 150, Tuli's argument that

---

[9]The SEC hotly disputes Tuli's characterization of Krause's deposition testimony.

the contradictory "current" testimony of Krause and Sorensen be relied on must be rejected.

Second, and more importantly, even were Tuli's interpretation of Krause's and Sorensen's "current" testimony accepted, summary judgment would still not be appropriate in light of the genuine and material factual disputes raised by Tuli's own statements.

The SEC's evidence indicates that Tuli may well have believed that the work required under the SOW was incomplete as of March 31, 2001.  The notes of an internal AOL investigation state that Tuli believed that "integration work was not completed as of March 31 (or even as of April 20)," and that "maybe 50 or 75% was done by March 31."  Tuli Interview at 1.  An AOL colleague of Tuli's, Paul Farrell, has testified that Tuli admitted he had confirmed to the auditors that work required under the SOW was finished, even though it was not.  Farrell Tr. at 1981-82; 2417.  This evidence alone is sufficient to create a genuine dispute of material fact with respect to whether Tuli knowingly misled PurchasePro officers and auditors.[10]

Tuli seeks to discount the investigation notes as the product of "an attorney new to the practice of law," and argues that his

_____

[10]Tuli attempts to refute Farrell's testimony by pointing to facts demonstrating that the alleged conversation could not have taken place at the time and place he indicated.  This argument underscores the existence of disputed facts in this case and goes directly to Farrell's credibility, which is an issue reserved for the jury.

statements need to be considered in context to be fully understood. Reply at 14-16.  Tuli's argument only highlights the necessity for a jury's determination of the facts.  Issues with respect to what may have been said or what meaning may have been intended are quintessential jury questions.

The evidence discussed demonstrates that there is a genuine dispute of material fact over whether Tuli knowingly assisted in the scheme to post $3.65 million to PurchasePro's books in the First Quarter.  Therefore, a genuine dispute of material fact exists as to whether Tuli possessed the requisite scienter to aid and abet the primary securities violations alleged.[11]

> **B.   A Genuine Dispute of Material Fact Exists as to Whether Tuli Substantially Assisted PurchasePro in a Scheme to Fraudulently Include an Additional $3.65 Million in First Quarter 2001 Revenue.**

The evidence also indicates that a genuine dispute of material fact exists as to whether the conduct described above "substantially assisted" a primary violation.  Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000).  To constitute "substantial assistance," the primary violations must be a "direct or reasonably foreseeable result" of the aider and abettor's conduct.  Mot. at 9 (citing Fraternity Fund Ltd. v. Beacon Hill Asset Mgt., LLC, 479 F. Supp. 2d 349, 371 (S.D.N.Y. 2007)); Opp. at 29.  In other words, it

---

[11]It should be remembered that the test for determining whether the dispute is "genuine" is whether "a reasonable jury could return a verdict for the non-moving party."  Arrington, 473 F.3d at 333, quoting Anderson, 477 U.S. at 248.

is necessary that the defendant "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, and that he seek by his action to make it succeed." <u>Zoelsch v. Arthur Andersen & Co.</u>, 824 F.2d 27, 36 (D.C. Cir. 1987) (quoting <u>Nye & Nissen v. United States</u>, 336 U.S. 613, 619 (1949)).

Tuli argues that under no circumstances could PurchasePro's violations be viewed as a direct or reasonably foreseeable result of his conduct.  There is evidence, however, that Tuli anticipated that PurchasePro officers would rely upon the certification of work completed under the SOW that he provided to PurchasePro and the auditors.  For instance, following his receipt of the draft certification letter from PurchasePro executives, Tuli was pressured by Johnson to sign it immediately.  Pl.'s Statement of Facts, Ex. 53.  Johnson's eagerness to receive the certification arguably made Tuli aware that Johnson and other PurchasePro officers viewed the certification as significant support for their First Quarter figures.

In addition, Tuli's April 18, 2001 e-mail provides evidence that Tuli was aware of efforts made by AOL to assist PurchasePro and its officers in reaching their First Quarter projections.  Tuli stated in that e-mail that during the week of April 5, 2001, Wakeford, Charles Johnson, Jr., and another AOL employee "had to make Junior whole to help him make his numbers."  Pl.'s Statement

of Facts, Ex. 68 (Apr. 18, 2001 e-mail from Tuli to "Bankoff").

The SEC has also presented evidence indicating that PurchasePro's officers relied upon the confirmatory call Tuli conducted with Larry Krause. Layne testified that the confirmation call was "paramount to [PurchasePro] being able to recognize the 3.65 million" because if "the answers were not correct . . . it could call into question the recognition of the revenue for that quarter." Layne Tr. at 4671.

With respect to the reliance of PurchasePro auditors, Tuli himself has admitted that he knew the certification he signed would be shown to Arthur Andersen. Tuli Dep. at 70. In addition, Larry Krause testified that he relied on the certification signed by Tuli and forwarded to him by PurchasePro in reaching his conclusions regarding PurchasePro's First Quarter revenue. See Krause Dep. at 104:11-19. Because the SEC has evidence indicating that Tuli knew that the certification would be used by PurchasePro's auditors, as well as evidence indicating that the certification was, in fact, relied upon by the PurchasePro auditors, a genuine dispute of material fact exists as to whether the violations of PurchasePro and its officers were a direct or reasonably foreseeable result of Tuli's substantial assistance.

Drawing all reasonable inferences in favor of the SEC, the evidence demonstrates that a genuine dispute of material fact exists as to whether Tuli associated himself with PurchasePro's

attempts to fraudulently claim additional First Quarter revenue, and sought "by his action to make it succeed." <u>Zoelsch</u>, 824 F.2d at 36.  Because the SEC can show genuine issues of material fact regarding Tuli's role in aiding and abetting the primary securities violations alleged, summary judgment is **denied.**

## IV.  CONCLUSION

For the reasons set forth above, Defendant Tuli's Motion for Summary Judgment [**Dkt. No. 180**] is **denied.**  An Order shall issue with this Memorandum Opinion.


January 16, 2008

<u> /s/ </u>
Gladys Kessler
United States District Judge


**Copies to: Attorneys of record via ECF**