**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMM'N,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | Civil Action No. 05-36 (GK) |
| ) | |
| **CHARLES JOHNSON, JR., <u>et al.</u>,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Securities and Exchange Commission ("SEC") brings this action against four individual Defendants (John Tuli, Kent Wakeford, Christopher Benyo, and Michael Kennedy, collectively "Defendants") alleging a fraudulent scheme to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc. ("PurchasePro"). This matter is before the Court on Defendant Kennedy's Motion for Summary Judgment [**Dkt. No. 179**]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendant Kennedy's Motion for Summary Judgment is **denied.**

I.    **BACKGROUND**[1]

   A.    **The Defendants' Alleged Scheme**

   The Defendants in this case are former executives of both PurchasePro, a publicly traded Internet company that provided a business-to-business internet marketplace, and America Online, Inc. ("AOL").

   Starting in December 2000, PurchasePro, AOL, and a third company, AuctioNet, which provided Internet auction services, entered into a series of agreements that required integration of AuctioNet into the websites of PurchasePro and AOL NetBusiness. According to the SEC, the agreements required a complex series of payments amongst the three companies. AOL was to receive $5 million from AuctioNet, keep $1 million for itself, and then pay the remainder (less a 20% commission) to PurchasePro after AOL received the funds. The SEC claims that AOL would begin to pay the net amount of $3.2 million to PurchasePro in quarterly installments beginning April 1, 2001.

   The SEC alleges that the Defendants developed a scheme to recognize the revenue from these agreements in the First Quarter of 2001. At the heart of the scheme was an allegedly sham Statement of Work between PurchasePro and AOL ("SOW") that would supposedly reflect that the integration work had occurred in the First

---

   [1] Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Material Facts submitted pursuant to Local Civil Rule 7(h).

Quarter, when it fact it had not.  The SOW would be used to convince PurchasePro's auditors, Arthur Andersen, that PurchasePro could recognize $3.65 million in revenue in the First Quarter of 2001.[2]

It is undisputed that the SOW was not finalized until after the First Quarter had ended.  It is also undisputed that PurchasePro Executive Vice President Geoff Layne and his assistant, James Sholeff, forged the signature of AOL officer Eric Keller on the SOW and that at some point, the SOW was also backdated to a date in the First Quarter.  However, the parties fiercely dispute the actual meaning of the SOW's terms.  The Defendants contend that sufficient integration work occurred in the First Quarter to meet the requirements set forth in the SOW.  The SEC responds that the SOW required integration work that was not completed in the First Quarter.

PurchasePro's outside auditor, Arthur Andersen, began to review PurchasePro's First Quarter revenue shortly after the end of the quarter.  The forged and backdated SOW was eventually provided to Arthur Andersen, which placed the document in its files and allegedly relied on it during the course of its audit.  Several of the Defendants, as well as Matthew Sorensen, a PurchasePro

---

[2] The $3.65 million figure stated in the SOW is distinct from the $3.2 million that the existing agreements required AOL to pay PurchasePro.  The record is unclear regarding the origins and components of the $3.65 million figure.

employee, allegedly made additional deceptive and misleading statements to the auditors regarding the recognition of revenue from the AuctioNet transaction.

On April 26, 2001, PurchasePro executives conducted a conference call with Wall Street analysts, PurchasePro shareholders, and others regarding its First Quarter revenues. The $3.65 million from the AuctioNet transaction was included in the revenues announced during the call. Jim Clough, PurchasePro's interim Chief Financial Officer, announced on the call that "[i]t's important to note that a full two-thirds of our revenue for the quarter was AOL-related. It includes . . . $3.7 million in integration services . . . . We apply a heightened degree of scrutiny to this revenue given the unique multi-element relationship we have with them." Pl.'s Statement of Facts, Ex. 27 (PurchasePro.com First Quarter Conference Call Transcript, Apr. 26, 2001) at 3. The $3.65 million from the AuctioNet transaction represented 12% of PurchasePro's reported First Quarter revenue.

PurchasePro also released a press release on April 26, 2001 announcing its earnings, which included the $3.65 million in revenue from the AuctioNet transaction. Arthur Andersen did not review this press release prior to its release.

On May 14, 2001, AOL sent a letter to PurchasePro stating that it could not confirm the existence of the SOW. PurchasePro, with the agreement of Arthur Andersen, subsequently decided that the

$3.65 million from the AuctioNet transaction should not have been included in PurchasePro's quarterly revenues. Accordingly, this revenue was not included in the Form 10-Q PurchasePro filed with the SEC on May 29, 2001.

**B.    Kennedy's Alleged Role in the Scheme**

Defendant Michael Kennedy was PurchasePro's Chief Technology Officer during the relevant period. The SEC alleges that Kennedy violated four sections of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq. Specifically, the SEC alleges that Kennedy aided and abetted PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b) and Rule 10b-5 (Count III); aided and abetted Defendants Benyo and Johnson's falsification of books and records and circumvention of internal controls in violation of Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 (Count V); aided and abetted Defendants Benyo and Johnson's misleading of an accountant or auditor in violation of Exchange Act Rule 13b2-2 (Count VII); and aided and abetted PurchasePro's falsification of books and records and circumvention of its system of internal controls in violation of Exchange Act Sections 13(b)(2)(A) and (B), 15 U.S.C. § 78m(b)(2)(A) and (B) (Count IX).

In particular, the SEC alleges that Kennedy signed the SOW following the conclusion of the First Quarter and was aware of its deceptive nature. Kennedy has testified that he first became aware

of the SOW "in the last couple of days" of the First Quarter. Pl.'s Statement of Facts, Ex. 93 (Testimony of Michael Kennedy Before the SEC, Apr. 10, 2002) ("Kennedy Testimony") at 14.  He understood the AuctioNet transaction to be a complex one and did not see the definitive requirements for the AuctioNet integration until after the First Quarter had ended.  Id. at 13.  Kennedy knew that PurchasePro was to receive $3.7 million for the integration work but allegedly felt it was a "pipe dream" to do the work before the quarter ended.  Pl.'s Statement of Facts, Ex. 3 (Decl. of Regina K. Burris & Mar. 3, 2003 FBI Form 302) ("Kennedy FBI Form 302") at 6.[3] Cindi Zimmerman, a member of Kennedy's staff informed him by e-mail that as of March 30, 2001, "NO integration existed." Pl.'s Statement of Facts, Ex. 96 (E-mail from Zimmerman to Kennedy, Apr. 2, 2001) (emphasis in original).  Kennedy told the FBI that he was aware of this email.  Kennedy FBI Form 302 at 11.

On April 2, Kennedy attended a meeting with fifteen to twenty PurchasePro employees to consider additional AuctioNet integration work.  Matthew Sorensen, who was present, described the attendees as angry that they were being asked to complete so much work in so little time and characterized the meeting as a "freak-out" session. Pl.'s Statement of Facts, Ex. 12 (Sorensen Dep., June 26 2007)

---

[3] There is no indication that Kennedy's statements to the Federal Bureau of Investigation ("FBI") were made as part of a plea negotiation.  Therefore they need not be excluded pursuant to Fed. R. Evid. 410(4).

("Sorensen Dep.") at 201-206.  A smaller meeting followed, attended by Benyo, Sorensen, and Kennedy.  Sorensen testified in his deposition that "what I remember best [about the meeting] is the result of that conversation, which was basically Chris Benyo saying we can put up a [hypertext] link and circle back and do the work before the auditors arrive."  Id. at 213.  Kennedy was displeased with this outcome, but authorized the link to be set up.  Id. at 214-15.

After the SOW was prepared by others at PurchasePro, it was presented to Kennedy for his signature in the first part of April 2001.  He testified at his deposition that he believed he signed it in the first two weeks of that month.  Pl.'s Statement of Facts, Ex. 8 (Dep. of Michael Kennedy, Aug. 13, 2007) ("Kennedy Dep.") at 99-100.  He understood that PurchasePro required a signed contract in order to recognize revenue, id. at 16, and that the SOW was being used to verify earnings.  Id. at 121.

Kennedy signed the SOW, but refused to backdate the document, despite the requests of Matthew Sorensen and Chris Hammond, another PurchasePro employee, that he do so to February 5, 2001, the date on the first page of the SOW.  Kennedy FBI Form 302 at 7-8. Kennedy recalled that the signature line for AOL was blank at the time he signed the SOW.  Kennedy Testimony at 29.

Kennedy later attended at least one of the meetings held by PurchasePro to decide whether to recognize revenue from the

7

AuctioNet transaction in First Quarter earnings.  Pl.'s Statement of Facts, Ex. 17 (<u>United States v. Benyo</u> Trial Transcript, Nov. 28, 2006) ("Boeth Tr.") at 3213.  Kennedy failed to raise any objection to the decision to include the AuctioNet revenue.  <u>Id.</u> at 3216.  Indeed, on a separate occasion, Kennedy confirmed to Shawn McGhee, PurchasePro's President and Chief Operating Officer, that the AuctioNet integration work was completed.  Pl.'s Statement of Facts, Ex. 22 (<u>United States v. Benyo</u> Trial Transcript, Dec. 20, 2006) at 6404.

The SEC also alleges that Kennedy stood to personally gain from PurchasePro's financial performance.  It is undisputed that he held options to acquire PurchasePro stock, and received an additional grant of stock options on April 10, 2001.  Like other PurchasePro executives, he also received $100,000 as a retention bonus during the First Quarter.

### C.   Procedural History

The Government brought both criminal and civil cases against the Defendants.  This civil case was stayed from November 9, 2005 until March 13, 2007, during which Defendants Wakeford, Tuli, and Benyo were tried and acquitted in the Federal District Court for the Eastern District of Virginia.  The charges against Defendant Kennedy were voluntarily dismissed by the Government.  A mistrial was declared as to the fifth Defendant, Charles Johnson, Jr.  His retrial began October 9, 2007 and Judge Walter DeKalb Kelley, Jr.

of the Eastern District of Virginia has the case under advisement. Scott Wiegand, PurchasePro's General Counsel, was acquitted following a bench trial in December 2005.

Upon completion of the criminal cases of the four Defendants, the stay in this civil case was lifted as to four of the Defendants (Wakeford, Tuli, Kennedy, and Benyo) but not as to Defendant Johnson, Jr.  After their acquittals, the four Defendants were extremely anxious to schedule an early trial in this case in the hope that they would be able to clear their names completely and resume normal lives.  For that reason, and because of the age of the case, on May 7, 2007, this Court entered a Scheduling Order with very short deadlines.  On July 13, 2007, at the request of the SEC, and over the objection of the Defendants, the Court extended discovery for one month until August 30, 2007.  Numerous depositions were held during the discovery period, and counsel on all sides worked diligently to complete discovery during that period.  In accordance with the Scheduling Order, summary judgment motions were filed by the Defendants on October 10, 2007.  On December 18, 2007, trial was continued as to Defendant Tuli until July 7, 2008, with the consent of the SEC.

## II.  STANDARD OF REVIEW

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

9

moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c), as amended December 1, 2007; <u>Arrington v. United States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006).  In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is it is "material" to the case.  "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" <u>Arrington</u>, (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  A fact is "material" if it might affect the outcome of the case under the substantive governing law.  <u>Liberty Lobby</u>, 477 U.S. at 248.

In its most recent discussion of summary judgment, in <u>Scott v. Harris</u>, __ U.S. __, 127 S. Ct. 1769, 1776 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 . . . (1986) (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Liberty Lobby</u>, 477 U.S. at 247-48.

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter,

but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 248, 249.  In both Liberty Lobby and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment.  Liberty Lobby, 477 U.S. at 255.  In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "the Court must draw all reasonable inferences in favor of the non-moving party."  Reeves, 530 U.S. at 150.  "To survive a motion for summary judgment, the party bearing the burden of proof at trial . . . must provide evidence showing that there is a triable issue as to an element essential to that party's claim.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)."  Arrington, 473 F.3d at 335.[4]

## III.  ANALYSIS

### A.  Summary Judgment Is Denied as to Count III (Aiding and Abetting PurchasePro's Alleged Rule 10b-5 Violation)

The SEC must prove three elements to establish liability for aiding and abetting a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

---

[4] It should be noted that a non-movant's affidavit may suffice to defeat a summary judgment motion if the parties' sworn statements are materially different.  Greene v. Dalton, 164 F.3d 671, 674-75 (D.C. Cir. 1999); Arrington, 473 F.3d at 337.

First, a principal must commit a primary violation.  Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000).  Second, the aider and abettor must provide "substantial assistance" to the primary violator.  Id. Third, the aider and abettor must act with the requisite scienter, i.e., "knowingly."  SEC v. Fehn, 97 F.3d 1276, 1288 n.11 (9th Cir. 1996);  SEC v. KPMG LLP, 412 F. Supp. 2d 349, 382-83 (S.D.N.Y. 2006);  see also the Court's Op. Den. Def. Wakeford's Mot. for Summ. J. at 15-19.

Kennedy raises four arguments in his reply that he claims "mandate" summary judgment in his favor.  Reply at 3.  Upon analysis, however, each argument demonstrates that a genuine issue of material fact does exist in this case and that summary judgment is therefore inappropriate.

First, Kennedy argues that the SEC cannot demonstrate that the work required by the SOW was not completed in the First Quarter. The SEC has presented evidence that refutes this point.  Sorensen testified on direct examination in the Benyo criminal trial that the SOW required full integration to occur in the First Quarter. On cross-examination, he then retracted this explanation, testifying instead that the SOW only required completion of one of the integration tasks it listed, and that such work had in fact been completed in the First Quarter.  Sorensen's credibility is directly in issue, given his "flip-flop" on this key point.

Sorensen's initial understanding of the SOW's requirements was corroborated by the trial testimony of Dale Boeth and testimony Kennedy gave before the SEC in 2002.  In addition, Cindi Zimmerman, wrote in an e-mail that as of March 30, 2001, "NO integration existed."  Pl.'s Statement of Facts, Ex. 96 (E-mail from Zimmerman to Kennedy, Apr. 2, 2001) (emphasis in original).  This conflicting evidence concerning whether the work specified in the SOW had been completed in the First Quarter is fully sufficient to defeat summary judgment.

Second, Kennedy argues that he cannot be found liable because he signed an earlier version of the SOW before it was later fraudulently altered by Layne.  However, the SEC has presented evidence that the version of the SOW signed by Kennedy was itself misleading because it reflected that integration work had occurred in the First Quarter, when in fact, little or no integration work had been done.

Third, Kennedy argues that Shawn McGhee did not rely on the SOW when he decided to recognize the AuctioNet earnings.  This, too, is disputed.  In his December 2006 trial testimony, McGhee said he had concerns about the authenticity of the SOW, but that the revenue documented in it was still included in earnings because PurchasePro management sought additional confirmation of the AuctioNet revenue.  Pl.'s Statement of Facts, Ex. 22 (United States v. Benyo Trial Transcript, Dec. 20, 2006) at 6364-65.  A reasonable

factfinder could construe McGhee's testimony to mean that he did rely on the SOW, at least in part, as well as other documentation, in deciding to recognize the AuctioNet revenue.  Furthermore, the SEC correctly points out that in weighing McGhee's credibility, the jury could consider that had the SOW not been created in the first place, McGhee would have had no revenue to confirm from additional sources.

Fourth and finally, Kennedy argues that there is no evidence that he was involved in, or otherwise had responsibility for, determining if the AuctioNet revenue would be recognized.

There is evidence that Kennedy was aware that little or no AuctioNet integration work had occurred in the First Quarter.  The SEC has also produced evidence showing that although Kennedy was displeased with it, he approved Benyo's plan to put up a hypertext link to deceive PurchasePro's auditors about the amount of integration work that had occurred and to then "circle back and do the work before the auditors arrive."  Sorensen Dep. at 213.

Kennedy also testified that he was aware that PurchasePro required a signed contract in order to recognize revenue from the AuctioNet transaction and that the SOW would be used to verify those earnings.  Despite this knowledge, Kennedy still signed the SOW, although he refused to backdate the document as requested by Sorensen and Hammond.  Finally, Kennedy told PurchasePro President and Chief Operating Officer Shawn McGhee that the AuctioNet

integration work was completed.   McGhee later made the decision to recognize the AuctioNet integration revenue.   Drawing all reasonable inferences in favor of the SEC, this evidence is sufficient to raise a genuine dispute of fact as to whether Kennedy knowingly substantially assisted PurchasePro's primary securities violation.

Therefore, Kennedy's motion for summary judgment as to Count III is **denied.**

**B.    Summary Judgment Is Denied as to Count V (Aiding and Abetting Johnson's and Benyo's Falsification of Books and Records and Circumvention of Internal Controls)**

Count V alleges that Kennedy aided and abetted Defendants Johnson's and Benyo's violations of Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, by circumventing PurchasePro's internal controls and falsifying its books and records.

As discussed above, the SEC has presented evidence that Kennedy signed the SOW, despite knowing that little or no AuctioNet integration work had occurred in the First Quarter, and approved Benyo's plan to deceive Arthur Andersen about the extent of integration work that had occurred.   This is sufficient to raise a genuine issue of material fact that Kennedy aided and abetted Johnson's and Benyo's violations of Section 13(b)(5).

Accordingly, Kennedy's motion for summary judgment on Count V is **denied.**

**C.   Summary Judgment Is Denied as to Count VII (Aiding and Abetting Johnson's and Benyo's Misleading of an Accountant or Auditor)**

Count VII alleges that Kennedy aided and abetted Johnson's and Benyo's misleading of an auditor in violation of Rule 13b2-2, 17 C.F.R. § 240.13b2-2, which prohibits making or causing to be made a materially false or misleading statement to an accountant in connection with an audit.

Here, too, the SEC has raised a genuine issue of material fact.  During the course of its audit, Arthur Andersen relied on the SOW, which Kennedy signed despite allegedly knowing of its misleading nature.  Kennedy also approved Benyo's plan to deceive the auditors by putting up the AuctioNet hypertext link.  Drawing all reasonable inferences in favor of the SEC, this evidence is sufficient to raise a genuine issue of material fact as to whether Kennedy aided and abetted the making of false or misleading statements to an accountant in connection with an audit.

Thus, Kennedy's motion for summary judgment on Count VII is **denied.**

**D.   Summary Judgment Is Denied as to Count IX (Aiding and Abetting PurchasePro's Falsification of Books and Records and Circumvention of Internal Controls)**

To establish liability for aiding and abetting a violation of Exchange Act Sections 13(b)(2)(A) and (B), 15 U.S.C. § 78m(b)(2)(A) and (B), the SEC must prove (1) that PurchasePro committed a primary violation; (2) that Kennedy substantially assisted the

violation; and (3) that he acted with the requisite scienter. Ponce v. SEC, 345 F.3d 722, 737 (9th Cir. 2003); see also the Court's Op. Den. Def. Wakeford's Mot. for Summ. J. at 15-19 (discussing the scienter standard set forth under Section 20(e) for aiding and abetting securities violations).

For the same reasons as stated above, the SEC has presented sufficient evidence to raise a genuine dispute of material fact as to whether Kennedy aided and abetted PurchasePro's falsification of books and records and circumvention of internal controls by signing the SOW, when he allegedly knew that AuctioNet integration work was not completed in the First Quarter, by approving Benyo's plan to deceive the auditors, and by later telling McGhee that all AuctioNet integration work was completed prior to his decision to recognize the earnings from the AuctioNet transaction.

Therefore, Kennedy's motion for summary judgment on Count IX is **denied.**

**IV.   CONCLUSION**

For the reasons set forth above, Defendant Kennedy's Motion for Summary Judgment [**Dkt. No. 179**] is **denied.**  An Order shall issue with this Memorandum Opinion.


January 16, 2008
                                        /s/
                                      _____
                                      Gladys Kessler
                                      United States District Judge


**Copies to: Attorneys of record via ECF**