**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
SECURITIES AND EXCHANGE       )
COMM'N,                       )
                              )
        Plaintiff,            )
                              )
    v.                        )   Civil Action No. 05-36 (GK)
                              )
CHARLES JOHNSON, JR., et al., )
                              )
        Defendants.           )
_____)
```

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Benyo's Motion in Limine to Preclude Admission of Material Subject to Federal Rule of Evidence 410 [**Dkt. No. 240**], Plaintiff's Fifth Motion in Limine (for Ruling that Statements by Defendant Benyo are Admissible) [**Dkt. No. 248**], and Defendant Kent D. Wakeford's Motion in Limine for a Trial Severance from Defendant Christopher Benyo or, in the Alternative, to Preclude Evidence as Unduly Prejudicial [**Dkt. No. 257**]. Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons stated below, Defendant Benyo's Motion in Limine to Preclude Admission of Material Subject to Federal Rule of Evidence 410 [**Dkt. No. 240**] is **granted**, Plaintiff's Fifth Motion in Limine [**Dkt. No. 248**] is **denied,** and Defendant Wakeford's Motion in Limine for a Trial Severance [**Dkt. No. 257**] is **denied** as moot.

## I.     BACKGROUND

Plaintiff Securities and Exchange Commission ("SEC") brings this action against four individual Defendants (John Tuli, Kent Wakeford, Christopher Benyo, and Michael Kennedy, collectively "Defendants"), alleging a fraudulent scheme to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc. ("PurchasePro"). The facts of this case are set forth in detail in the Court's Memorandum Opinions of January 16, 2008, denying Defendants' respective motions for summary judgment, and will not be repeated herein.

On December 28, 2007, Defendant Benyo and Plaintiff The Securities and Exchange Commission ("SEC") moved in limine for a ruling from this Court with respect to the admission of evidence of alleged statements Benyo made during two meetings with criminal prosecuting authorities in 2003. Defendant Wakeford also has moved for a trial severance should such evidence be admitted.

The statements at issue were given by Benyo to prosecutors and FBI agents on August 25 and September 12, 2003.[1] Benyo met with these Government representatives pursuant to a proffer agreement dated August 25, 2003, which was entered into between (i) the United States Attorney's Office for the Eastern District of Virginia and the Department of Justice, Criminal Division, and (ii)

---

[1] Additional discussions between Benyo and the U.S. Attorney's Office took place in late 2004 and early 2005. These later discussions are not the subject of the instant motions in limine.

Benyo and his counsel.

The meetings were initiated by Assistant U.S. Attorney Claudius Modesti, who contacted Benyo through his counsel, Terrance Reed, in the early summer of 2003. According to Reed,[2] Modesti informed him that a grand jury criminal investigation of PurchasePro and its officers and employees, including Benyo, was then taking place. Pl.'s Mot. in Limine, Ex. 1 at ¶5 ("Reed

---

[2] Reed's factual recitation of the relevant events has, for all practical purposes, been unopposed by the Government. Although the Government objects to Reed's characterization of the meetings at issue as "plea negotiations," Rep. to Benyo's Opp. to Pl.'s Fifth Mot. in Limine at 5, the affidavits it has submitted from AUSAs Modesti and Connolly do not directly challenge the facts set forth in Reed's affidavit.

Indeed, Modesti concedes that he "do[es] not have a specific recollection of the plea discussions alleged in Mr. Reed's declaration." SEC Opp. to Benyo Mot. in Limine, Ex. 1 at ¶7 ("Modesti Decl."). Because Modesti has no recollection of the discussions in question, he can only claim that if he had initiated any plea discussions with Benyo, it would have been his practice to inform other members of his investigation team. Id. Therefore, in its attempt to refute in some way Reed's compelling affidavit, the SEC submits an affidavit from a member of Benyo's investigation team, Charles Connolly, who was not involved in the discussions with Benyo and merely states that he has no recollection of Modesti ever informing him of plea negotiations with Benyo in August and September 2003. SEC Opp. to Benyo Mot. In Limine, Ex. 2 at ¶5 ("Connolly Decl.").

The SEC contends that these AUSA declarations "further establish that no plea offers existed at or around the time of the interviews." Rep. to Benyo's Opp. to Pl.'s Fifth Mot. in Limine at 3. That is not correct. At best, the AUSA declarations merely demonstrate that Modesti and Connolly have no recollection of having engaged in "plea discussions" – however they may define that term – not that they did not take place. As the parties' briefs demonstrate, the parties disagree as to what the term "plea discussions" entails. Given the SEC's failure to refute any of the concrete facts set forth in Reed's affidavit, the Court has no choice but to treat those facts as undisputed.

Decl."). During the summer prior to August 25, 2003, Modesti also informed Reed that he would like to initiate plea bargaining negotiations with Benyo.

Reed stated that Modesti was conducting plea bargain negotiations with several PurchasePro personnel, and that Benyo would receive more favorable treatment if he engaged in similar negotiations before all of the other negotiations were finalized. Id. at ¶6. Modesti also indicated that he was discussing pleas of guilty to serious felonies with other PurchasePro personnel, and that the plea negotiations with Benyo might result in a similar plea proffer from him. Id. at ¶7. According to Reed, Modesti represented that his office had calculated the Sentencing Guideline range for the alleged securities violations under investigation. Because the Guidelines were mandatory at that time, and the alleged securities losses were substantial, Modesti calculated that the potential sentences for all charged PurchasePro personnel was twelve years of incarceration.[3] Id.

Modesti told Reed that in order to pursue the plea negotiation process, Benyo would have to agree to meet and talk with the

---

[3]Prior to the first proffer session, Reed confirmed with counsel for other PurchasePro personnel that they had undertaken or completed plea negotiations with Modesti, and that he was making similar representations to them regarding the applicable Sentencing Guideline range. Reed Decl. at ¶8. See also Benyo's Rep. to Pl.'s Fifth Mot. in Limine, Ex. 1 ("Rosenthal Decl.") (discussing contemporaneous representations Modesti was making to another PurchasePro officer, Jeffrey Anderson).

prosecutors pursuant to a proffer letter agreement, a signed version of which he forwarded to Reed for Benyo's counter signature. Id. at ¶¶8-9. Reed and his client executed a copy of the proffer agreement at the commencement of their August 25, 2003 meeting with prosecutors and the FBI at the U.S. Attorney's office in Alexandria, Virginia. Id. at ¶10. After the conclusion of the meeting, Reed was told that Benyo would need to meet with prosecutors again to complete the plea negotiation process, and that the next meeting would be subject to the same proffer letter. Id. at ¶10. A follow-up meeting was conducted at the U.S. Attorney's office on September 12, 2003. Id. at ¶10.

Following these meetings with Benyo, the FBI agents who were in attendance prepared memoranda, known as FBI Forms 302, memorializing their recollection of statements made by Benyo during these interviews. Special Agent Regina K. Burriss attended Benyo's August 25, 2003 interview, took contemporaneous notes, and, approximately three months later, used her notes and "parts of the interview . . . still fresh in [her] memory" to draft a Form 302. Pl.'s Fifth Mot. in Limine, Ex. 2. Special Agent Mary Jo Ervin attended the September 12, 2003 interview, took contemporaneous notes, and drafted a Form 302 documenting her recollection of the interview. That Form 302 was drafted approximately a month after

Benyo's second interview, on October 14, 2003.[4]  See Pl.'s Fifth Mot. in Limine, Ex. 3.  Ervin prepared the Form 302 using her memory of statements made by Benyo in the interview, and later compared it to her contemporaneous notes to confirm its accuracy. Id.

At some point in the discussions between Benyo's counsel and the U.S. Attorney's office, the prosecuting authority made offers to Reed to have Benyo plead guilty.  Id. at ¶12.  A few weeks before the return of the indictment in the Department of Justice's case against various PurchasePro personnel, Benyo was given a deadline of January 10, 2005 in which to accept the proposed plea. Id. at ¶12.  Benyo declined to accept the plea, but various other PurchasePro personnel did, entering into agreements with the U.S. Attorney's office by which they either were not charged or pled to felonies for which the sentencing exposure was less than five years.  Id. at ¶15.  See also Rosenthal Decl.

**II.  ANALYSIS**

Federal Rule of Evidence 410 provides that "any statement made

---

[4]The SEC plans to call Burris and Ervin to testify at trial about purported admissions made by Benyo during the interviews. The SEC indicates that for this testimony the FBI agents would have to rely upon the Form 302s as their past recollection recorded. Pl.'s Fifth Mot. in Limine at 3.  Given Federal Rule of Evidence 410, the admissibility of such reliance need not be addressed. However, it would seem difficult for a memorandum drafted by a witness either one month or three months after the fact to be deemed made or adopted "when the matter was fresh in the witness' memory."  Fed. R. Evid. 803(5).

in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty" is not admissible against the defendant who participated in the plea discussions. Because the statements allegedly made by Benyo in the August and September 2003 meetings and memorialized in the FBI Form 302s were made in the course of plea discussions, they are inadmissible under Rule 410.

Rule 410 was created to promote active plea negotiations and plea bargains, which our Supreme Court has acknowledged are "important components of this country's criminal justice system." U.S. v. Davis, 617 F.2d 677, 683 (D.C. Cir. 1980) (discussing Fed. R. Crim. P. 11(e)(6), which is "virtually identical" to Rule 410, and quoting Blackledge v. Allison, 431 U.S. 63, 71 (1977)). Our Court of Appeals has held that "in order for plea bargaining to work effectively and fairly, a defendant must be free to negotiate without fear that his statements will later be used against him." Davis, 617 F.2d at 683 (citations and quotations omitted). Indeed, absent the protection of Rule 410, "the possibility of self-incrimination would discourage defendants from being completely candid and open during plea negotiations." Id. (citation and quotations omitted).

> **A. The August and September 2003 Meetings between Benyo and the U.S. Attorney's Office Qualify as "Plea Bargaining," and Therefore Any Statements Made by Benyo at Them are Inadmissible under Federal Rule of Evidence 410.**

It has widely been held that "[w]hether a party is engaged in

plea discussions is a factual question that must be determined on a case-by-case basis." U.S. v. Serna, 799 F.2d 842, 848 (2d Cir. 1986) (citing U.S. v. Grant, 622 F.2d 308, 312 (8th Cir. 1980)). In U.S. v. Wood, 799 F.2d 842, 934-36 (1989), our Court of Appeals set forth the test for our Circuit: whether the parties intended to "dispose of the matter through extraction of information and, possibly a plea."[5]

### 1. The Existence and Content of the Proffer Agreement Demonstrate that Plea Negotiations Occurred in August and September 2003.

The evidence in this case indicates that AUSA Modesti set up the August and September 2003 meetings for the purpose of extracting information and possibly reaching a plea agreement.

First, AUSA Modesti contacted Benyo's counsel and said that "in order to pursue the plea negotiation process, Mr. Benyo would have to agree to meet and talk with the prosecutors." Reed Decl. at ¶9. The August and September meetings apparently were held in response to that request. The SEC correctly states that Rule 410 "applies only to 'plea' negotiations, not to every offer of cooperation." U.S. v. Graham, 91 F.3d 213, 219 (D.C. Cir. 1996) (citations omitted). The instant case, however, involved much more

---

[5] The Court's opinion in United States v. Graham, 91 F.3d 213, 219 (D.C. Cir. 1996), is completely consistent with the test set forth in Wood. Notwithstanding the SEC's arguments to the contrary, Graham does not narrow the Wood holding; rather, it clarifies that Rule 410 is inapplicable to post-conviction bargaining.

than a mere "offer of cooperation" – the Government initiated contact with Benyo and actively sought his cooperation.

Second, the August and September meetings were initiated by Modesti in the context of broader plea bargaining discussions with other PurchasePro officers and employees, some of whom actually reached plea agreements along the lines of that proposed by Modesti to Benyo.  Rosenthal Decl. at ¶¶7, 9.  This fact bolsters the conclusion that in contacting Benyo and other PurchasePro personnel, AUSA Modesti was attempting to extract information in exchange for plea agreements.

Third, the proffer agreement itself evidences the existence of plea negotiations.  The central piece of evidence upon which the Court of Appeals relied in <u>Wood</u> in concluding that plea discussions took place was a letter from the prosecutor to the defendant which characterized the meeting in question as an "'off-the-record' proffer or discussion."  <u>Id.</u> at 936.  Notwithstanding this qualification that the meeting was "off-the-record," the Court held that the letter's reference to "the procedures which will be followed as we <u>continue</u> our negotiations concerning the possible disposition of the above-captioned case" indicated that the Government "perceived the discussion to be part of their efforts to dispose of the matter-through extraction of information from Wood and, possibly, a plea."  <u>Id.</u> (emphasis added).

Likewise, the proffer agreement entered into between the

Government and Benyo indicates that the Government was seeking discussions with Benyo in order to extract information and possibly reach a plea. Although the existence of a signed proffer agreement may not automatically turn any subsequent discussion into plea bargaining per se, it is indicative of that conclusion. As the Second Circuit has held, "[o]rdinarily, statements made by a defendant during plea negotiations, including proffer sessions, are inadmissible at trial." U.S. v. Velez, 354 F.3d 190, 194 (2d Cir. 2004); U.S. v. Barrow, 416 F.3d 109, 116 (2d Cir. 2005) ("[s]tatements made by defendants in proffer sessions are covered by Rule 410"). In this case, the U.S. Attorney's Office contacted Benyo through his counsel and made clear that signing a proffer agreement was a precondition to entering into discussions regarding a possible plea. Reed Decl. at ¶9. Moreover, the proffer letter itself indicates that prior to the August and September 2003 meetings, AUSA Modesti already had participated in at least one conversation with Benyo's counsel regarding the possibility of Benyo providing information to the Government concerning the criminal investigation. See Pl.'s Fifth Mot. in Limine, Ex. 1 at 1 ("Proffer Agreement").

    **2. The Context and Content of the August and September 2003 Discussions Demonstrate that They Involved Plea Negotiations.**

Nor is the proffer agreement the only evidence that plea negotiations took place between the Government and Benyo in August

and September 2003.  Arguing that the Court of Appeals did not set forth a clear standard in Wood, the SEC asks that the Court adopt the factors used by the Eighth Circuit in assessing whether plea negotiations have occurred.  While the Court of Appeals's holding in Wood provides more than sufficient guidance, even were the Court to adopt the Eighth Circuit's standard,[6] the Form 302s still would be inadmissible under Rule 410.

First, the fact that those meetings occurred with both the Assistant U.S. Attorney and Benyo's counsel present (and were initiated by the U.S. Attorney), provides strong evidence that the meetings involved more than a mere "offer of cooperation."[7]  See U.S. v. Serna, 799 F.2d 842, 848 (2d Cir. 1986) (noting the participation of retained counsel and an AUSA in discussions as evidence that plea negotiations had taken place).

Second, Reed has represented (and his representation has gone unrebutted) that at some point during the discussions, AUSA Modesti presented the defense with a specific Sentencing Guideline calculation generated by his office which indicated the potential

---

[6] In U.S. v. Edelmann, 458 F.3d 791, 804 (8th Cir. 2006) (citation omitted), the Eighth Circuit listed factors it considers in assessing the applicability of Rule 410, including whether: (1) a specific plea offer was made; (2) a deadline to plead was imposed; (3) an offer to drop specific charges was made; (4) discussion of sentencing guidelines occurred; (5) a defense attorney had been retained to assist in the formal plea bargaining process.

[7] Graham, 91 F.3d at 219

for twelve years of incarceration. Reed Decl. at ¶7. This fact, among others, distinguishes our case from that presented to the Eighth Circuit in U.S. v. Hare, in which the Guidelines were discussed "somewhat," and "only in general terms and not for the purpose of negotiating a plea." 49 F.3d 447, 450 (8th Cir. 1995).

Finally, at all times Benyo was made aware that he was working under a fixed deadline: the indictment return date.[8] Whether the August and September 2003 meetings are viewed as a separate set of discussions from those that took place in December 2005, or whether the 2003 and 2005 discussions are viewed as one continuing, albeit intermittent, plea discussion, the fact of the matter is that under Wood, these are plea negotiations covered by Federal Rule of Evidence 410.

**B.   The SEC Is Not a Party to the 2003 Proffer Letter Agreement Executed by the U.S. Attorney's Office and Benyo, and Therefore May Not Invoke it Against Benyo.**

The SEC asserts that even if Rule 410 is found to apply to the FBI Form 302s, it should nevertheless be permitted use of Benyo's statements pursuant to the proffer agreement, which it contends amounts to at least a partial waiver of Benyo's Rule 410 rights. The proffer agreement indicates statements made by Benyo pursuant to the proffer may be used for "impeachment, cross-examination and rebuttal" should Benyo contradict those statements in "any future

---

[8] Benyo was not given a date certain for the indictment's issuance until a few weeks before its return date of January 10, 2005. Reed Decl. at ¶9.

proceedings." Proffer Agreement at 1. The SEC concedes that it is not a signatory to the proffer agreement, but argues that it should be considered a third-party beneficiary of the agreement. This argument lacks merit.

The proffer agreement identifies the parties to the agreement as Mr. Benyo and the "government," with the term government expressly defined as the "United States Attorneys Office for the Eastern District of Virginia and the Department of Justice, Criminal Division." Id. Not only is the SEC not a party to the agreement, but nothing within the proffer letter indicates that either of the parties to the agreement intended to benefit the SEC as a third-party, as is required for the SEC to be considered an intended beneficiary.[9] Bowhead Information Tech. Servs., LLC., v. Catapult Tech., Inc., 377 F. Supp.2d 166, 171 (D.D.C. 2005) (parties to a contract must "directly and unequivocally intend to benefit a third-party in order for that third party to be considered an intended beneficiary") (quoting Barnstead Broad. Corp. v. Offshore Broad. Corp., 886 F.Supp. 874, 879 (D.D.C. 1995)).[10]

---

[9] Moreover, although the SEC appears to rely upon the Restatement (Second) of Contracts §302 to justify its invocation of the proffer agreement, it utterly fails to identify "circumstances indicat[ing] that the promisee intends to give the beneficiary the benefit of the promised performance," as the Restatement would require under these facts.

[10] The Restatement (Second) of Contracts § 302 provides:
(1) Unless otherwise agreed between promisor and promise, a

-13-

**III. CONCLUSION**

For the reasons set forth above, Defendant Benyo's Motion in Limine to Preclude Admission of Material Subject to Federal Rule of Evidence 410 [**Dkt. No. 240**] is **granted**, Plaintiff's Fifth Motion in Limine [**Dkt. No. 248**] is **denied,** and, therefore, Defendant Wakeford's Motion in Limine for a Trial Severance [**Dkt. No. 257**] is **denied** as moot.   An Order shall issue with this Memorandum Opinion.


February 13, 2008                    /s/
                                     Gladys Kessler
                                     United States District Judge


Copies to: Attorneys of record via ECF

---

beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
    (a) the performance of the promise will satisfy an obligation of the promise to pay money to the beneficiary; or
    (b) the circumstances indicate that the promisee intends to the give the beneficiary the benefit of the promised performance.