**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMM'N, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) |
| CHARLES JOHNSON, JR., <u>et</u> <u>al.</u>, | ) ) |
| Defendants. | ) ) |

Civil Action No. 05-36 (GK)

### <u>MEMORANDUM OPINION</u>

Plaintiff Securities and Exchange Commission ("SEC") filed this action against four individual Defendants (John Tuli, Kent Wakeford, Christopher Benyo, and Michael Kennedy, collectively "Defendants") on January 10, 2005, alleging a fraudulent scheme to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc. ("PurchasePro"). On April 24, 2008, an eleven-member jury found Defendant Christopher Benyo liable on Count Three of this Complaint, for aiding and abetting PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5.[1] On May 2, 2008, Defendant Benyo filed the instant Motion for Judgment as a Matter of Law or in the Alternative for a New Trial [**Dkt. No. 505**]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and

---

[1]The jury found the other two Defendants in this case, Kent Wakeford and Michael Kennedy, not liable with respect to each of the claims brought against them. Defendant Benyo was found not liable on three of the four claims against him.

for the reasons stated below, Defendant Benyo's Motion for Judgment as a Matter of Law or in the Alternative for a New Trial [**Dkt. No. 505**] is **denied**.

I.    **BACKGROUND**[2]

A.    **Benyo's Role in the Scheme**

Defendant Christopher Benyo was PurchasePro's Senior Vice President for Marketing and Network Development during the relevant time period.  The SEC alleged in its Complaint that Benyo violated four sections of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a <u>et</u> <u>seq</u>.  Specifically, the SEC alleged that Benyo aided and abetted PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 (Count Three); falsified books and records and circumvented internal controls in violation of Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 (Count Four); misled an accountant or auditor in violation of Exchange Act Rule 13b2-2 (Count Six); and aided and abetted PurchasePro's  falsification of books and records and circumvention of its system of internal controls in violation of Exchange Act Sections 13(b)(2)(A) and (B), 15 U.S.C. § 78m(b)(2)(A) and (B) (Count Nine).

---

[2] Unless otherwise noted, the facts set forth herein are drawn from the evidence presented by the parties at trial.

The SEC alleged in particular that Benyo helped orchestrate the creation of the fraudulent Statement of Work ("SOW").[3]   The Statement of Work was executed after the close of the First Quarter of 2001, but was back-dated in an effort to lead auditors and investors into believing that the revenue referenced therein was recognized in the First Quarter.   The SEC presented evidence at trial that PurchasePro never completed the project documented in the Statement of Work, and that Benyo was involved in concealing that fact.   Among other evidence presented, Matthew Sorensen, a PurchasePro employee, testified that Benyo proposed the creation of an Internet hyperlink designed to generate the false appearance, for the benefit of PurchasePro's auditors, that the services described in the Statement of Work had actually been performed.

Prior to PurchasePro's announcement of its First Quarter earnings in an April 26, 2001 analyst call, PurchasePro executives held a number of meetings to discuss what revenue could be recognized in the First Quarter.   According to Dale Boeth,

---

[3]At the heart of the scheme in which Benyo participated was a sham Statement of Work between PurchasePro and America Online, Inc. ("AOL") that would supposedly reflect that certain "integration work" (integrating the technology of a third company, AuctioNet, which provided Internet auction services, into the websites of PurchasePro and AOL NetBusiness) had occurred in the First Quarter of 2001, when it fact it had not.   The SOW would be used to convince PurchasePro's auditors, Arthur Andersen, that PurchasePro could recognize $3.65 million in revenue in the First Quarter of 2001.   See Court's January 16, 2008 Memorandum Opinion Denying Defendant Benyo's Motion for Summary Judgment [Dkt. No. 304] for a more detailed discussion.

PurchasePro's Senior Vice President for Strategic Development, when the revenue associated with AuctioNet and the SOW were discussed, Benyo voiced no opposition to including this revenue in PurchasePro's quarterly earning announcement.  Benyo was an active participant on the April 26, 2001 analyst conference call.  He made a number of references to revenue related to PurchasePro's relationship with AOL.  The SEC presented evidence at trial that Benyo failed to disclose any facts relating to the fraudulent nature of the SOW during the call.

The SEC also presented evidence at trial that Benyo stood to personally gain from PurchasePro's performance.  Benyo held options to purchase company stock and received an additional grant of options on April 10, 2001.  Like other PurchasePro executives, he also received $100,000 as a retention bonus during the First Quarter.

PurchasePro included $3.65 million in revenue from this contract in its April 26, 2001 earnings announcement.  PurchasPro did not include it in the revenue figure reported in the Form 10-Q filed with the SEC on May 29, 2001, because the auditors subsequently became aware of information raising concerns about the authenticity of the contract.

**B.    Procedural History**

Defendant Benyo's trial before this Court began on March 6, 2008, and lasted nearly seven weeks.  An eleven-member jury began

4

its deliberations on April 22, 2008, and returned a verdict on April 24, 2008.  The jury found Defendants Wakeford and Kennedy not liable on all counts against them.  Defendant Benyo, too, was found not liable as to Count Four (falsifying books and records and circumventing internal controls), Six (misleading an accountant or auditor), and Nine (aiding and abetting the falsification of records and circumvention of internal controls).  As to Count Three, however, the jury found Defendant Benyo liable for aiding and abetting PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5.[4]

## II.   STANDARD OF REVIEW

District courts may grant judgment as a matter of law only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the nonmoving party.  Holbrook v. Reno, 196 F.3d 255, 259 (D.C. Cir. 1999)(quoting Fed. R. Civ. P. 50(a)(1)).  In

---

[4]Rule 10b-5 states that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

a.   To employ any device, scheme, or artifice to defraud,

b.   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

c.   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

5

making this determination, all evidence is viewed in the light most favorable to the nonmoving party, and all conflicts are resolved in that party's favor. Id. at 259-60. A district court has a duty to "draw all reasonable inferences in the nonmoving party's favor without making credibility determinations or weighing the evidence." Gasser v. District of Columbia, 442 F.3d 758, 762 (D.C. Cir. 2006)(internal quotation marks omitted)(quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

Our Court of Appeals has stated that "the grant of judgment as a matter of law is rarely appropriate," Martin v. Howard Univ., 2008 WL 1885434, at *3 (D.C. Cir. May 20, 2008), and that "[i]ntrusion upon the rightful province of the jury is highly disfavored." The Court of Appeals has also "repeatedly emphasized that the jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable people could not disagree on the verdict." Smith v. District of Columbia, 413 F.3d 86, 97 (D.C. Cir. 2005) (alterations and quotation marks omitted).

A slightly lower, but still onerous, standard applies to a motion requesting that a jury verdict be overturned in favor of a new trial. Lewis v. Elliott, 628 F. Supp. 512, 515-16 (D.D.C. 1986) (citations omitted). Generally, "a new trial may only be granted when a manifest error of law or fact is presented." Long v. Howard Univ., 512 F. Supp. 2d 1, 6 (D.D.C. 2007)(quotation marks

and citation omitted).  As with granting judgment as a matter of law, district courts "should be mindful of the jury's special function in our legal system and hesitate to disturb its finding."

Id.  As this Court has long-recognized, a trial court

> is not supposed to supplant the jury's view with that of its own and order a new trial simply because the court would have weighed the evidence differently from the jury.  Rather the court's discretion to order a new trial is limited to those situations where the verdict represents a miscarriage of justice.

Martinez v. District of Columbia, 503 F. Supp. 2d 353, 355 (D.D.C. 2007)(citations omitted).  Indeed, a court should only grant a motion for new trial "where the court is convinced that the jury verdict was a seriously erroneous result and where denial of the motion will result in a clear miscarriage of justice."  Bowie v. Maddox, 540 F. Supp. 2d 204, 208 (D.D.C. 2008)(quotation marks and citations omitted).

## III. **ANALYSIS**

To find Benyo liable on Count Three of this Complaint, for aiding and abetting PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, the jury had to find that the SEC had proven by a preponderance of the evidence that (a) a primary violation of Section 10(b) or Rule 10b-5 had been committed,(b) Benyo had provided "substantial assistance" to the primary violator, and (c) that he had done so "knowingly." S.E.C. v. Johnson, 530 F. Supp.2d 325, 332-334 (D.D.C. 2008).  As discussed above, to prevail on his current motion, Benyo must show

either that "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the nonmoving party (warranting judgment as a matter of law), or that a manifest error of law or fact is presented (warranting a new trial).

### A. The SEC Presented Sufficient Probative Evidence that Defendant Benyo Knowingly Assisted in Commission of the Alleged Primary Violation.

To find Benyo liable for aiding and abetting a Section 10(b) and Rule 10b-5 violation, the jury had to find that Benyo knowingly[5] assisted in the fraudulent scheme to falsely claim revenue in the First Quarter of 2001. Notwithstanding Benyo's contention to the contrary,[6] more than sufficient evidence was presented to sustain a finding by the jury on this legal issue.

---

[5] As the jury was instructed in this case,

To act "knowingly" means to act intentionally, deliberately, and voluntarily, rather than mistakenly or inadvertently. An aider and abetter must know that the primary violation is being committed and act in a way which is intended to bring about its success.

Jury Instr. No. 3.1.

[6] Benyo contends that in order to establish his knowledge of the fraudulent scheme, the SEC had to prove that Benyo knew of both the forged SOW and the two legitimate contracts on which it was based, "including knowledge of their differing payment terms, and knowledge of the associated revenue recognition principles." Mot. at 4 (emphasis in original).

Benyo misstates the required proof. The SEC was under no obligation to prove Benyo's familiarity with the underlying documents. Rather, the SEC had only to show that Benyo was aware that the revenue contained in the SOW should not have been claimed in the First Quarter of 2001, but substantially assisted the scheme to do so notwithstanding that fact.

Benyo admitted in his trial testimony that he knew PurchasePro's earnings projection for First Quarter 2001 "was a very big number" and that he and other PurchasePro management had warned Charles Johnson, Junior, PurchasePro's CEO and co-founder, against making such an earnings announcement. Benyo Trial Test., Apr. 2, 2008, at 83.   Benyo admitted as the First Quarter was drawing to a close, that "it was hard to see how much business" PurchasePro would be able to book before the end of the quarter, and that the company would be "heavily dependent on AOL resources" to reach its projections. Id. at 84-85.   Indeed, Benyo admitted to having drafted a press release for the First Quarter of 2001 which stated that PurchasePro was going to miss its guidance target for both top line revenue and cash earnings per share. Id. at 89.

The SEC also introduced testimony from an attorney, Michael Rugen, who had interviewed Benyo as part of PurchasePro's internal investigation.   In his conversation with Rugen, Benyo admitted that he knew of the plan to use a statement of work involving AuctioNet integration in order to generate more revenue, and that he learned of that plan very close to the end of March 2001.   Michael Rugen Dep. Excerpts at 73.

While Benyo argues that he was unfamiliar with revenue recognition principles and therefore could not have had the requisite scienter to be found liable for aiding and abetting a violation of Section 10(b) and Rule 10b-5, the SEC introduced at

trial evidence to the contrary.   Indeed, the SEC presented testimony from PurchasePro President and Chief Operating Officer Shawn McGhee, Dale Boeth, and Arthur Andersen auditor Larry Krause, all of which indicated that PurchasePro had in place widely known rules regarding what could be recognized as revenue in any given quarter, and that Benyo was familiar with these rules.   See Opp. at 5-6.   Specifically, McGhee and Boeth testified that it was understood throughout PurchasePro's top management, and would have been known to Benyo, that (1) a contract for revenue had to be written and signed by both parties before the end of the quarter, and (2) all work under that contract had to be finished by the end of the quarter.   McGhee Trial Test., Mar. 6, 2008, P.M. Sess., at 52, 75; Boeth Trial Test., Mar. 17, 2008, P.M. Sess., at 9-10.

McGhee also testified regarding how these rules would have been applied to the SOW:   in order to claim revenue from such a document in the First Quarter of 2001, it would have to be written and signed by March 31, 2001.   McGhee Trial Test., Mar. 6, 2008, P.M. Sess., at 54-55.   The SEC introduced a substantial amount of evidence suggesting that Benyo not only knew these rules, but knew that the SOW had not been written and signed by that date.   See Opp. at 7.   Including in that evidence was testimony from Benyo himself, in which he admitted that he directed his staff to work on writing the SOW in April 2001, after the First Quarter of 2001 had

ended.[7]  Benyo Trial Test., Apr. 3, 2008, A.M. Sess., at 20, 103-04.

The SEC also introduced more than sufficient evidence to support a finding by the jury that Benyo knew the work under the SOW was not finished by the end of the First Quarter of 2001, thereby violating the second revenue recognition rule referenced above.  Boeth testified that he had overheard a conversation between Benyo and others on March 30, 2001, discussing that the AuctioNet integration project required 1,000 to 2,000 hours more to complete.  Boeth Trial Test., Mar. 17, 2008, P.M. Sess., at 31-32. Boeth further testified that "it was Mr. Benyo's idea that we could accomplish <u>the appearance of the integration</u> through a link."  <u>Id.</u> at 79 (emphasis added).  A jury could reasonably conclude, based on Boeth's testimony alone, that Benyo was aware that the integration required by the SOW and its underlying contracts had not been completed by the end of the First Quarter, and therefore that he knew claiming revenue under the SOW would be improper.

---

[7]Benyo argues in his motion, and argued at trial, that pre-existing contracts between AOL, PurchasePro, and AuctioNet would have justified claiming $3.65 million in the First Quarter, even though the SOW was not signed in that time period.  The SEC's expert witness provided testimony sufficient for a jury to reject this argument.  <u>See</u> Vondra Trial Test., Apr. 8, 2008, A.M. Sess., at 30-31.  Even had it not, however, the SEC provided substantial evidence showing that PurchasePro's revenue recognition rules were not met, as the work required under the SOW was not finished in the First Quarter of 2001.

However, Boeth's testimony is not the only evidence of Benyo's awareness of the impropriety of including SOW revenue in PurchasePro's First Quarter numbers. Benyo received notice in early April 2001 that the AuctioNet integration work was not completed,[8] and testified at trial that he knew AuctioNet integration work was still ongoing in April, May, and even June of 2001. Benyo Trial Test., Apr. 3, 2008, A.M. Sess., at 21. Notwithstanding this awareness that integration work had not yet been completed, Sorensen testified that on April 2, 2001, Benyo proposed a plan to create a hyperlink, to convince the auditors that the integration work had been completed, and to then "circle back" later to do the actual work before the auditors arrived to inspect. Sorensen Dep. Excerpts at 213:13-16. Clearly, it was up to the jury to decide whether to believe Sorensen's testimony.

Benyo's knowledge of the fraudulent nature of the scheme is further evidenced by other portions of Sorensen's testimony. Sorensen testified that he provided a demonstration to the auditors of the deceptive hyperlink proposed by Benyo, and later reported that fact to Benyo. Id. at 253-54. Sorensen testified that Benyo's response was, "I'll be glad when this is over." Id. In addition, Sorensen testified that Benyo instructed him to send what Sorensen believed, and told Benyo at the time would be, a false e-

---

[8] See Opp. at 9 n.25.

mail stating that the work required under the SOW was complete. See id. at 127-28.

Finally, the SEC also introduced sufficient evidence to support a jury finding that Benyo knew that PurchasePro was including the AuctioNet revenue in its First Quarter 2001 results, notwithstanding the fact that the relevant revenue recognition rules would prohibit it. Boeth testified that Benyo was present for at least one internal PurchasePro meeting held in the days immediately preceding its earnings announcement in which inclusion of the AuctioNet revenue was discussed. Boeth Trial Test., Mar. 17, 2008, P.M. Sess., at 85-87. Benyo did not object to the inclusion of that revenue in the First Quarter figure; nor did he disclose the facts that he knew regarding the impropriety of claiming that revenue. Id.

The evidence discussed above demonstrates that the SEC presented more than sufficient probative evidence to support a finding that Benyo knowingly aided and abetted PurchasePro's Section 10(b) and Rule 10b-5 violation. Defendant Benyo attempts to rebut this conclusion by pointing to the jury's verdict in his favor on two of the other counts alleged. Mot. at 8-10. Benyo speculates as to what arguments or evidence the jury may have accepted or rejected in reaching a verdict on the other counts, and

what conclusions the jury "must" have reached based on the evidence presented and the instructions given.[9] <u>Id.</u>

Because Defendant did not request a special verdict form, speculation is the only recourse available for ascertaining the rationale behind the jury's findings, and it is clear that speculation alone "cannot serve as a basis for disturbing the judgment." <u>Muldrow v. Re-Direct, Inc.</u>, 397 F. Supp. 2d 6, 8 n.2 (D.D.C. 2005).

**B.  The SEC Presented Sufficient Probative Evidence that Defendant Benyo Substantially Assisted PurchasePro's Decision to Include the AuctioNet Revenue in its Earnings Release and Announcement.**

Benyo contends that McGhee made the decision to include the AuctioNet revenue in the First Quarter 2001 earnings announcement, and that McGhee relied solely upon AOL Vice President John Tuli's confirmations in coming to that decision. Mot. at 13. Therefore, Benyo argues that the SEC "failed to adduce any evidence" that Benyo substantially assisted the fraud to include that revenue in the First Quarter announcement. <u>Id.</u> Notwithstanding Benyo's assertions to the contrary, the trial record demonstrates sufficient probative evidence to support the jury's finding that

---

[9]Benyo stops short of arguing that the jury's verdict was inconsistent, and therefore the Court need not consider that question. However, it deserves noting that even "when faced with an apparently inconsistent verdict, a court has a duty to attempt to read the verdict in a manner that will resolve inconsistencies." <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 806 (1986).

Benyo substantially assisted PurchasePro's decision to include AuctioNet revenue in its earnings release and announcement.

First, the SEC introduced evidence at trial suggesting that Benyo substantially assisted in the creation of the SOW, and that had the SOW not been created in the first place, McGhee would have had no revenue to confirm from additional sources such as Tuli. Given the evidence presented by the SEC that Benyo instructed two subordinates, Joyce and Sorensen, to put together the SOW after the close of the First Quarter, the jury could have concluded that the SOW would not have come into being without Benyo's assistance, and therefore that AuctioNet revenue would not have been included in the First Quarter figure without Benyo's assistance. Similarly, even if the jury agreed with Benyo that McGhee relied only on Tuli's confirmation, and not on the SOW directly, the jury could reasonably have found that because Tuli explicitly relied upon the SOW in his confirmation, Benyo substantially assisted in the revenue's inclusion in the First Quarter figure. Plaintiff's Ex. 129 (stating that "all work covered under the Statement of Work dated February 5, 2001" had been completed).

A jury likewise could have found, based on the evidence presented by the SEC, that were it not for Benyo's orchestration of the hyperlink and its deceptive demonstration, the auditors would not have believed that the integration work had been completed in the First Quarter, and would have prevented the revenue from being

15

claimed.  Indeed, Larry Krause testified that he relied on the SOW in certifying the First Quarter earnings figure.  Krause Dep. Excerpts at 88.  Krause further testified that he did not know that the SOW had been written after the close of the First Quarter, and that such knowledge would have been a factor in deciding whether to agree that such revenue could be included in the First Quarter earnings announcement.  Id. at 137-39.

Second, the SEC adduced evidence which could have lead a reasonable jury to believe that Benyo's failure to disclose material facts about the SOW and the required integration work substantially assisted in the scheme's success.  McGhee testified that Benyo had not told him that the SOW was written after the close of the First Quarter, and that if he had, it probably would have made a difference to him in deciding whether to include that revenue in the First Quarter earnings announcement.  McGhee Trial Test., Mar. 6, 2008, P.M. Sess., at 81-82.

The evidence discussed above provides a sufficient basis for a reasonable jury to have found that Benyo substantially assisted in PurchasePro's Section 10(b) and Rule 10b-5 violation.

## C.   The SEC Presented Sufficient Probative Evidence of the Commission of a Primary Violation by PurchasePro.

The SEC presented the jury sufficient probative evidence to support a finding that PurchasePro had committed a primary violation of Section 10(b) and Rule 10b-5.  Benyo argues that in order to support a finding of a violation on the part of

16

PurchasePro, "the SEC must establish that the person who acted on behalf of PurchasePro – here its President Shawn McGhee . . . acted knowingly or with extreme recklessness." Mot. at 15.  Benyo cites two Seventh Circuit cases in an attempt to support his claim that the SEC was required to show that Shawn McGhee had the requisite scienter.  The cases do not support his conclusion.

> In <u>Pugh v. Tribune Co.,</u> the Seventh Circuit held that
>
> the corporate scienter requirement must focus upon the "state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance or who furnish information or language for inclusion therein, or the like) rather than to the collective knowledge of all of the corporation's officers and employees acquired in the course of their employment."
>
> 2008 WL 867739, at *8 (7th Cir. Apr. 2, 2008)(quoting <u>Makor Issues & Rights, LLC v. Tellabs, II</u>, 513 F.3d 702, 708 (7th Cir. 2008)).

Benyo has provided no case law suggesting that our Court of Appeals has adopted this standard. Even if he had, it is plain that a reasonable jury could have found a primary violation on the part of PurchasePro under this standard.  Indeed, <u>Pugh</u> explicitly includes for purposes of corporate scienter not only those who, like McGhee in this case, made or issued the statement, but also those who "order[ed] or approve[d] it or its making or issuance or who furnish information or language for inclusion therein, or the like."  The jury was presented sufficient evidence to support a reasonable finding that PurchasePro officers who engaged in just

such activities also had the requisite scienter.  Indeed, applying the Seventh Circuit's formulation of corporate scienter, multiple PurchasePro officers, including Layne and Boeth, could have provided the requisite scienter.

Both Layne and Boeth furnished information or language for inclusion in the earnings statement, and each admitted that they knew claiming the AuctioNet revenue in the First Quarter of 2001 was fraudulent at the time in question.[10]  Given the evidence presented regarding Boeth and Layne's role in the earnings announcement and their scienter, the jury had sufficient probative evidence to find that PurchasePro had engaged in a Section 10(b) or Rule 10b-5 violation.

**D.    The SEC Presented Sufficient Probative Evidence that Venue Lies in this District.**

Defendant Benyo contends that the SEC failed to submit sufficient probative evidence that venue lies in this District, and as a result, that judgment as a matter of law is warranted.  Benyo asserts that the "sole transaction at issue in the trial of this case was the AuctioNet transaction," and that all the events

---

[10]Layne Trial Test., Mar. 20, 2008, P.M. Sess., at 61 ("Yesterday Mr. Schertler asked you, when in your mind and in your heart that the AuctioNet Statement of Work deal was a fraudulent deal . . . When do you believe that the fraud concerning the AcutioNet SOW began?  I believe as we ended the month of March in the first quarter 2001."); Boeth Trial Test., Mar. 18, 2008, P.M. Sess., at 92 ("the meeting  . . . on the 30th.  That's where I felt that what we were doing was a short cut, just to get it in so we could recognize the revenue for the quarter.").

surrounding this transaction took place in Las Vegas, Nevada.  In response, the SEC argues that Johnson's filing of a 10K and 10Q with the SEC on behalf of PurchasePro provides the necessary basis for venue, under the co-conspirator theory.

The parties agree that none of the $3.65 million improperly claimed in connection with the AuctioNet transaction was included in any SEC filing.  Nor did the SEC introduce at trial any evidence other than the SEC filing which connects the AuctioNet transaction to this District.[11]

Under the Exchange Act, venue is proper "in the district wherein any act or transaction  constituting the violation occurred . . . or in the district wherein the defendant is found or is an inhabitant or transacts business. . . ."  15 U.S.C. § 78aa.  It is well-settled that the filing of documents with the SEC has a locus in the District of Columbia and establishes venue here.  See SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1154 (D.C. Cir. 1978).

It is also true that "the intent of the venue and jurisdiction provisions of the securities laws is to grant potential plaintiffs liberal choice in their selection of a forum."  Sec. Investor Prot. Corp. v. Vigman, 764 F.2d 1309, 1317 (9th Cir. 1985) (internal

---

[11]PurchasePro's First Quarter 2001 earnings announcement, which improperly included the AuctioNet revenue, was accompanied by a press release and an earnings call, two events which could potentially have connected the transaction to the District of Columbia.  However, the SEC failed to introduce any evidence at trial that either the press release or earnings call actually reached anyone in the District of Columbia.

citations omitted).  Accordingly, in securities fraud cases involving multiple defendants acting in multiple districts, courts routinely apply the co-conspirator theory of venue.  <u>See</u>  <u>SEC v. Diversified Indus.</u>, 465 F. Supp. 104, 111 (D.D.C. 1979); <u>Hilgeman v. Nat'l Ins. Co. of America</u>, 547 F.2d 298 (5th Cir. 1977); <u>Wyndham Associates v. Bintliff</u>, 398 F.2d 614 (2d Cir. 1968), <u>cert. denied</u>, 393 U.S. 977 (1968); <u>see also</u> 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, <u>Federal Practice and Procedure</u> § 3824 (3d Ed. 2007).

In May 2007, this Court held the co-conspirator theory of venue applicable to this case when it denied a similar motion filed by Benyo which argued for summary judgment due to improper venue. <u>See</u> May 24, 2007 Mem. Op. at 4-9 ["Mem. Op."].[12]  The co-conspirator venue theory provides that "any act committed material to and in furtherance of an alleged fraudulent scheme will satisfy the venue requirement of the Exchange Act as to all defendants wherever the defendants are found."  <u>SEC v. Nat'l Student Marketing Corp.</u>, 360 F. Supp. 284, 292 (D.D.C. 1973); <u>see also</u> <u>Diversified Indus.</u>, 465 F. Supp. at 111 ("The co-conspirator venue theory, in essence, provides: '[A]ny allegation of a securities act violation is

_____

[12]The SEC erroneously asserts that in its earlier opinion, the Court decided that venue existed because of the nationally distributed press release.  The Court held no such thing.  Rather, the Court, in a footnote, merely observed that some courts had found publication of representations in the national press sufficient to establish venue.  Mem. Op. at 8 n.4.

sufficient for venue purposes even as to a defendant who did not commit an act within the district if that defendant is in league with a defendant who did act within the district.'").

A plaintiff must show only "one act within the district which represented more than an immaterial part of the allegedly illegal events." Diversified Indus., 465 F. Supp. at 111. The act of a single defendant in the district is deemed to be the act of all the defendants and will establish venue as to all. See Schreiber v. W.E. Hutton & Co., 382 F. Supp. 297, 299 (D.D.C. 1974) ("[T]he act of one [conspirator] is deemed to be the act of all the co-conspirators and venue is established as to all of them in that district.").

Although Benyo may have been found liable only for conduct relating to the AuctioNet transaction, the Complaint made clear from the inception of this case that the conspiracy alleged by the SEC involved not just AuctioNet, but "a series of fraudulent actions by defendants to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc." for the Fourth Quarter of 2000 and the First Quarter of 2001. Compl. at 1. The Complaint not only outlined a broad scheme for inflating revenues, but identified the co-conspirators of the scheme: "Defendant Charles Johnson, Jr. . . . directed the overall fraudulent scheme while two former executives of PurchasePro—defendants Chris Benyo and Michael Kennedy . . . took

knowing and deliberate steps in furtherance of the fraudulent scheme." Compl. at 1.

Benyo argues that "the arguments and allegations [the SEC] made with respect to the co-conspirator venue doctrine [in its Complaint] are inapplicable to the claims it tried in 2008 against Benyo," and that the SEC failed to allege as part of its Complaint or in its case at trial that Benyo was part of such a conspiracy. Reply at 21-22.[13]  This argument is unsupported by the record.

Indeed, Benyo's counsel conceded in his opening argument that the SEC would allege at trial a conspiracy in which Benyo played a part: "the SEC . . . wants you to think that there is this conspiracy of these gentlemen – or a scheme of these gentlemen to inflate the revenue."  Trial Tr. Mar. 5, 2008, P.M. Sess., at 49:23-24.  Benyo's counsel also referenced the conspiracy on multiple occasions throughout the trial, styling it the "Bagel Café Conspiracy."  In his opening statement, Benyo's counsel even referred to the SOW – the only forged document involved in the

_____

[13]To bolster his argument, Benyo points to an <u>in limine</u> ruling made by this Court to exclude from trial 404(b) evidence regarding transactions other than AuctioNet.  Feb. 26, 2008 Order [Dkt. No. 346] at 1.  Such a ruling prohibited the use of such evidence for 404(b) purposes, but did not act as an absolute bar to any reference to such material at trial, as Benyo implies.  There is no question that evidence was introduced regarding other transactions, and the admission of such evidence was not objected to by Benyo's counsel or any other counsel for Defendants.  <u>See, e.g.,</u> Trial Test. of Jeffrey Anderson, Mar. 12, 2008, at 50-51 (referencing China.com transaction).

AuctioNet transaction – as one of multiple documents that had been forged as part of the larger Bagel Cafe Conspiracy.  See id. at 63.

The jury concluded that Benyo aided and abetted this conspiracy, which culminated in the filing with the SEC in Washington, D.C. of a 10-K and 10-Q that contained fraudulent and misleading financial information.  Compl. ¶¶ 3, 47-53.  As this Court already has held, those filings were a material part of the alleged overall scheme.  Mem. Op. at 7-8.  Because Benyo aided and abetted a scheme, a material part of which occurred in the District of Columbia, venue for the claims against him is proper in this District.  See also Diversified Indus., 465 F. Supp. at 111 (holding that venue lies in the District of Columbia in securities fraud case alleging, inter alia, fraudulent bookkeeping).

**E.  Defendant Benyo Has Failed to Show that the SEC Made an Improper Closing Argument**

Defendant Benyo urges the Court to order a new trial because of references made by the SEC in its closing argument to the guilty pleas of several PurchasePro officers.  Specifically, Benyo complains about references made to Dale Boeth's and Jeffrey Anderson's guilty pleas.  Benyo argues that these references were prejudicial and improper, but points to no rule to support this conclusion.  Indeed, the only case cited by Benyo is a criminal case in which our Court of Appeals held that "A government witness' guilty plea obviously may not be used as substantive evidence of the guilt of defendants, but the plea is equally obviously

admissible to show the witness' acknowledgment of his role in the offense . . . ." U.S. v. Tarantino, 846 F.2d 1384, 1404-05 (D.C. Cir. 1988).

The D.C. Circuit has given no indication that it intended the rule Benyo cites to apply in the civil context.  However, even if it had, that rule would not require a new trial in this instance. Analyzing the SEC's references to Boeth's and Anderson's guilty pleas in context leaves no doubt that the pleas were not being cited as substantive evidence of the guilt of these Defendants. Rather, the pleas were invoked to show the witness's acknowledgment of their own role in the offense.  See Trial Tr., Apr. 21, 2008, A.M. Sess., at 100:3-8.  More importantly, the guilty pleas were referenced to rebut Defendants' argument that because they did not participate in the forgery of the SOW, they could not have participated in the Bagel Café Conspiracy.  See Trial Tr., Apr. 22, 2008, P.M. Sess., at 11-12 ("you heard Jeff Anderson indicate that he pled guilty to the crime involving AuctioNet fraud, even though he wasn't involved in the forgery.  You heard Dale Boeth testify he wasn't aware of any relevance of the Bagel Café meeting to the fraudulent activities that he was involved in, and he pled guilty to a crime involving the AuctioNet fraud as well.").

Even assuming the D.C. Circuit intended its holding in Tarantino to apply in the civil context, Benyo has failed to show

that the SEC's argument was improper under that holding. Therefore, a new trial is not warranted on that ground.

## IV.  CONCLUSION

For the reasons set forth above, Defendant Benyo's Motion for Judgment as a Matter of Law or in the Alternative for a New Trial [**Dkt. No. 505**] is **denied.**  An Order shall issue with this Memorandum Opinion.

July 14,2008
_____

/s/_____
Gladys Kessler
United States District Judge

**Copies to: Attorneys of record via ECF**