## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES & EXCHANGE       :
COMMISSION,       :
      :
      **Plaintiff,**       :
      :
      **v.**       :       **Civil Action No. 05-36 (GK)**
      :
**CHARLES JOHNSON,** *et al.*,       :
      :
      **Defendants.**       :

### MEMORANDUM ORDER

Plaintiff Securities and Exchange Commission ("SEC") filed this action against four individual Defendants (John Tuli, Kent Wakeford, Christopher Benyo, and Michael Kennedy, collectively "Defendants") on January 10, 2005, alleging a fraudulent scheme to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc. ("PurchasePro"). On April 24, 2008, an eleven-member jury found Defendant Christopher Benyo ("Benyo") liable on Count Three of this Complaint, for aiding and abetting PurchasePro's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5. Benyo was found not liable on the remaining three of the four claims against him.

The SEC has now filed a request for the entry of three remedial orders against Benyo. Specifically, the SEC seeks a permanent injunction against any future violations by Benyo of the applicable securities laws which were violated in this case, imposition of a permanent bar against Benyo serving as an officer or director of a publicly held company, and imposition of a civil monetary penalty of $120,000. Having considered the SEC's Memorandum in Support of Remedies,

the Defendant's Opposition, the Reply, and the extensive record in this case, including the trial

testimony and exhibits, the Court grants the SEC's request in part and denies it in part for the

following reasons.

I.[1]    Benyo was PurchasePro's Senior Vice President for Marketing and Network

Development during the relevant time period, namely, March and April of 2001. The SEC presented

substantial evidence at trial in support of its allegations that Benyo helped orchestrate creation of a

fraudulent Statement of Work ("SOW") that was drafted and executed after the close of

PurchasePro's First Quarter of business, ending March 31, 2001, but was back-dated to February 5,

2001, before the close of the First Quarter, in an effort to lead auditors and investors into believing

that the revenue described in that SOW was recognized in the First Quarter.[2]  The SEC presented

evidence at trial that PurchasePro did not complete the project documented in the Statement of Work

before the close of the First Quarter, and that Benyo was involved in concealing that fact. Among

other evidence presented, Matthew Sorensen, a PurchasePro employee, testified that Benyo proposed

---

[1]    The facts pertaining to this case are set forth in great detail in this Court's
Memorandum Opinion denying Benyo's Motion for Judgment as a Matter of Law or, in the
Alternative, for a New Trial [Dkt. #505], issued July 14, 2008; this Court's Opinions denying
Plaintiff's Motions for Summary Judgment [Dkt. #304, #306, #308, #310], issued January 16, 2008,
and the exhaustive Opinion issued by Judge Walter D. Kelley, Jr. of the Eastern District of Virginia,
issued May 15, 2008.

[2]    At the heart of the scheme in which Benyo participated was a sham Statement of
Work between PurchasePro and America Online, Inc. ("AOL") that would supposedly reflect that
certain "integration work" (integrating the technology of a third company, AuctioNet, which
provided Internet auction services, into the websites of PurchasePro and AOL NetBusiness) had
occurred in the First Quarter of 2001, when in fact it had not. The SOW would be used to convince
PurchasePro's auditors, Arthur Andersen, that PurchasePro could recognize $3.65 million in revenue
in the First Quarter of 2001. Recognition of the $3.65 million would help PurchasePro reach the
revenues it had previously publicly projected to the investing public. See Court's January 16, 2008
Memorandum Opinion Denying Defendant Benyo's Motion for Summary Judgment [Dkt. #304] for
a more detailed discussion.

the creation of an Internet hyperlink designed to generate the false appearance to PurchasePro's auditors and investors that the services described in the Statement of Work had actually been performed before March 31, 2001.

Prior to PurchasePro's announcement of its First Quarter earnings in an April 26, 2001 analyst call, Purchase Pro executives held a number of meetings to discuss exactly what amount of revenue could be recognized in the First Quarter.  According to Dale Boeth, PurchasePro's Senior Vice President for Strategic Development, when the revenue associated with AuctioNet and the SOW were discussed, Benyo voiced no opposition to including it in PurchasePro's quarterly earning announcement.  Benyo was an active participant on the April 26, 2001 analyst conference call, and made a number of references to the revenue related to PurchasePro's relationship with AOL.  The SEC also presented evidence at trial that Benyo failed to disclose any facts relating to the fraudulent nature of the SOW during that call.

II.      Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), authorizes the Court "to enjoin" any "acts or practices constituting a violation of any provision of this title [or] the rules or regulations thereunder."  Such injunctive relief may be provided by making a "proper showing." Id. Injunctions are appropriate remedies with regard to those who directly violate the securities laws and those who aid and abet violations.  See SEC v. Fehn, 97 F.3d 1276, 1296 (9th Cir. 1996).

In SEC v. Savoy Industries, 587 F.2d 1149, 1168 (D.C. Cir. 1978), our Court of Appeals stated that, where the SEC seeks an injunction regarding future conduct (rather than to halt an ongoing violation), "the ultimate test is whether the defendant's past conduct indicates . . . there is a reasonable likelihood of further violation(s) in the future."  The Court of Appeals has applied the following factors in assessing whether an injunction is warranted:  (1) whether the violation was "an

isolated incident"; (2) whether the defendant has "demonstrated that he understands his conduct to have been wrongful"; (3) whether he gives "sufficient assurances against future violations"; and (4) whether his "business activities may present him with further temptations to violate the law." Id.; SEC v. Huttoe, Civil Action No. 96-2543 (GK), 1998 WL 34078092, at \*12 (Sept. 14, 1998).

A.      As to the first factor, it is true that Benyo committed a number of separate actions to achieve his desired result of misleading the auditors and the public about the amount of revenue to be recognized in the First Quarter of 2001.  In that sense, his violation of the Exchange Act included a number of discrete individual acts, all designed to mislead the public, and were not "isolated incidents."

For example, it was Benyo who knew that the AuctioNet integration project could not possibly be finished by March 31, 2001, the end of the First Quarter, and who offered the suggestion that PurchasePro establish a hyperlink to the AuctioNet site in order to create the appearance that full integration had been accomplished.  Benyo's proposal was one important component of the overall plan to mislead investors about the status of PurchasePro's revenues for the First Quarter of 2001. It was on April 2, 2001, after the close of the First Quarter, that Benyo proposed his plan to create the hyperlink to the Auctionet site and then "circle back" to the actual work before the auditors arrived to perform their full inspection of the business.

In addition, Benyo participated in at least one meeting of high-level PurchasePro employees which occurred shortly before PurchasePro's announcement on April 26, 2001 of its First Quarter 2001 revenues.  At that meeting,  Benyo did not raise any objections to the announcement  nor did he inform those present of the facts about creation of the deceptive hyperlink.  When PurchasePro officers held the public conference call on April 26, 2001 with stock analysts and others, Benyo

spoke and referred to revenue that PurchasePro had received due to its relationships with AOL, knowing that that reference included the AuctioNet revenue which had not in fact been received.

Thus, it is true that Benyo's wrongful actions in this case did include, as the SEC argues, a series of misrepresentation and omissions of material facts.

However, for purposes of considering whether these actions were "isolated incidents" under Savoy Industries, it is clear that they were all one ongoing "incident" relating to the inclusion of one item of revenue, albeit the "incident" was composed of several different actions all designed to achieve the same goal.  Moreover, it is significant that Benyo had never previously committed such fraudulent conduct or violation of the Exchange Act.  He had been a high level manager in this area of the business world for a number of years prior to 2001, and there is nothing in the record to suggest that he had ever committed illegal acts or misled the public.  Therefore, viewed in context, his hyperlink scheme, with the attendant actions he took to accomplish it, did constitute "an isolated incident," as described in Savoy.

B.       It must not be forgotten that the issuance of a permanent injunction against future securities violations is a "drastic remedy and not a mild prophylactic." SEC v. Yun, 148 F. Supp.2d 1287, 1293 (M.D. Fla. 2001), vacated on other grounds, 327 F.3d 1263 (11th Cir. 2003).  In determining the appropriateness of imposing such a drastic remedy, which would undoubtedly have a far reaching impact upon Benyo's future livelihood and success in the commercial world, the courts have focused on whether there is a reasonable likelihood that, "unless enjoined, the violations will continue." SEC v. First Jersey Securities, 1010 F.3d 1450, 1477 (2d Cir. 1996).

The SEC has not carried its burden of proof on this issue.  As noted, Benyo is a "first offender" and this episode was an isolated one in a career that spanned more than ten years.  The

SEC cannot rely only upon "the mere facts of past violations." SEC v. Levine, 517 F. Supp.2d 121, 147 (D.D. C. 2007). In short, it "has not demonstrated that the defendant[] engaged in the type of repeated and persistent misconduct which usually justifies the issuance of injunctive relief." SEC v. National Student Marketing Corp., 457 F. Supp. 682, 715 (D.D.C. 1978).

The SEC also argues that a permanent injunction should be entered against Benyo because his present business activities could provide opportunities for further violation of the Exchange Act. Benyo has been working as an Executive Vice President for Sales and Marketing since 2002 at a private firm called Nuvox. Nuvox claims on its web site that it is "one of the largest Competitive Local Exchange Concerns in the Southeast United States." Ex. 1 to Plaintiff's Memorandum in Support of Remedies. Although Nuvox was a publicly held company, it has been privately held for the last five years. As a non-public, private company, Nuvox has no legal reporting obligations to the SEC. Therefore, it is very doubtful that either its officers or its employees could commit securities violations regarding financial disclosures they have no legal obligation to make.

C.      The SEC also argues that Benyo has not recognized the wrongful nature of his actions because he testified in a July 2007 deposition that he thinks he did nothing wrong. Needless to say, Benyo has a right to vigorously contest the SEC's allegations and was not required "to behave like Uriah Heep in order to avoid an injunction." SEC v. First City Financial Corp., 890 F.2d 1215, 1229 (D.C. Cir. 1989).

D.      For all these reasons, the Court concludes that a permanent injunction against the commission of future Exchange Act violations is unsupported by the evidence, and is far too draconian a remedy in light of Benyo's activities and personal history. Having said that, there is still a need, in light of Benyo's significant role in devising the scheme to mislead the auditors and the

public, to provide an additional degree of protection to the public for a limited period of time.  Based

on all the factors described, the Court concludes it appropriate to enter an injunction enjoining Benyo

from committing future violations of the Exchange Act for a period of five years from the date of

this Order.

       III.     The SEC also seeks a permanent injunction enjoining Benyo from serving as an

officer or director of a publicly held company.  For the reasons already discussed, the Court

concludes that a permanent bar from serving as an officer or director of a publicly held company is

totally inappropriate and disproportionate to the statutory violation committed.  In evaluating

whether such a bar is appropriate, the courts often examine the following factors which are very

similar to those weighed when considering whether or not to impose a permanent injunction against

violations of the Exchange Act.  In SEC v. Patel, 61 F.3d 137, 142 (2d Cir. 1995), the court set forth

the following factors which are usually considered in making this determination:  "(1) the

'egregiousness' of the underlying securities violation; (2) the defendant's 'repeat offender' status;

(3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of

scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct

will recur."

       As to the "egregiousness" of Benyo's violation, while it was serious and clearly intended to

mislead, it was not of a magnitude to support a permanent injunction.  The Court has already

examined the other Patel factors, except Benyo's economic stake in the violation.  While Benyo did

not actually gain any money from his violation of the Exchange Act, he did have a substantial

economic stake in the transaction.  He earned a good salary at PurchasePro, had substantial other

benefits such as stock options and a retention bonus, and anticipated that PurchasePro would

continue to prosper in the future. As to Benyo's degree of scienter, Benyo certainly knew exactly what he was doing and the consequences of failure by PurchasePro to meet its projected revenue goals.

As noted, for the reasons stated in Section I, a permanent bar against serving as an officer or director of a publicly held company is far too draconian a remedy. Given the specific intent with which Benyo acted and his understanding at the time that his actions were very questionable, the Court concludes that a five year bar is appropriate.

IV.     Section 21(d)(3)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), authorizes imposition of civil money penalties for violations of the Exchange Act. Aiders and abettors are subject to such monetary penalties. Section 21(d)(3)(B) contains a three-tier range of penalty amounts that may be imposed, depending upon the criteria listed.

Table II of 17 CFR 201.1002, sets forth the maximum penalty amounts for "violations occurring after February 2, 2001." Table II shows that the maximum amounts under Section 21(d)(3) of the Exchange Act are adjusted as follows: Tier 1, $6,500; Tier 2, $60,000; and Tier 3, $120,000.      The SEC seeks the maximum penalty under Tier 3 of $120,000. That request is just plain foolish. Given the economic and regulatory climate in which we now live and have lived for the past decade or more, to assess the <u>maximum</u> monetary penalty against Benyo -- who received not a penny of gain for his violation of the Exchange Act when others have stolen and bilked investors out of millions of dollars (not to say billions in one recent highly publicized case in particular) -- demonstrates the poor prosecutorial judgment of the Commission.

It is hornbook law that the purpose of a civil monetary penalty is to punish the defendant and deter him and others from securities violations. <u>SEC v. Kenton Capital, Ltd.</u>, 69 F.Supp.2d 1, 17

(D.D.C. 1998). In this case, Benyo has already been significantly punished. As a first time offender,

he has endured a four month criminal trial where he was acquitted, the present seven week civil trial

where he was found liable on only one of the four charges alleged against him, the loss of his

employment at PurchasePro, the loss of his full time employment at Nuvox when he was indicted,[3]

and the liability for what must undoubtedly be massive legal bills incurred to defend himself. While

the Court cannot put any dollar figure on the emotional distress and reputational damage that Benyo

has suffered, its existence cannot be discounted. In light of all the facts discussed, and the fact that

two juries have found substantially in Benyo's favor, the Court considers Tier 2, the maximum

amount of which is $60,000, to be appropriate. See SEC v. Ramoil Management Ltd., 2007 WL

3146943, * 13 (S.D.N.Y. October 27, 2007) (case was "not Enron," defendant was neither "a

criminal mastermind" nor the "primary wrongdoer," and "gained nothing from his actions."). The

Court, in the exercise of its discretion, finds that a fine of $35,000 to be paid over a period of two

years, is sufficient to adequately punish Benyo and deter him and others from violation of the

Exchange Act.


January 27, 2009                                    /s/
                                                   Gladys Kessler
                                                   United States District Judge


**Copies via ECF to all counsel of record**

---

[3]     After his acquittal, Benyo was rehired by Nuvox as an executive vice president.